**Mack WARDELL, as Conservator of Neal Wardell, a minor, Appellant (Plaintiff),**

v.

**Jon McMILLAN, M.D. and Stan Peters, M.D., Appellees (Defendants).**

**Stan PETERS, M.D., Appellant (Defendant),**

v.

**Mack WARDELL, as Conservator of Neal Wardell, a minor, Appellee (Plaintiff).**

**Jon McMILLAN, Appellant (Defendant),**

v.

**Mack WARDELL, as Conservator of Neal Wardell, a minor, Appellee (Plaintiff).**

Nos. 91–66, 91–67 and 91–68.

Supreme Court of Wyoming.

Dec. 31, 1992.

James E. Fitzgerald, Sharon A. Fitzgerald, and A.G. McClintock of Fitzgerald Law Offices, Cheyenne, and Donald W. Molloy of Molloy Law Offices, Billings, MT, for plaintiff.

William F. Downes, Jeffrey C. Brinkerhoff, and Jon B. Huss of Brown and Drew, Casper, for defendant McMillan.

Robert M. Shively and Rex O. Arney of Murane & Bostwick, Casper, for defendant Peters.

John E. Stanfield of Smith, Stanfield & Scott, Laramie, and George Santini of Graves, Santini & Villemez, P.C., Cheyenne, for amicus curiae Wyoming Trial Lawyers Ass'n.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ.

MACY, Chief Justice.

Mack Wardell, as the conservator of Neal Wardell, a minor, filed medical malpractice suits against Jon M. McMillan, M.D. and Stan Peters, M.D. Wardell alleged that the doctors negligently treated his son, Neal, and proximately caused his quadriplegia. Following a lengthy trial, the jury returned a verdict favorable to. the doctors, and the court entered a judgment. On appeal, Wardell asserts that the trial court denied him a fair trial by: (1) unduly restricting jury selection; (2) erroneously instructing the jury that medical professionals are *presumed* to have acted with due care; and (3) improvidently denying Wardell's motion in limine to exclude references at trial to prior settlements.

We reverse and remand.

Wardell raises the following issues on appeal:

I.   Did the trial court erroneously restrict plaintiff's jury selection? Specifically:

A.   Did the trial court err when, although it called two alternate jurors, it failed to afford each side an additional peremptory challenge, as required by Rule 47(b), W.R.C.P.?

B.   Did the trial court err in giving the two defendants twice the number of peremptory challenges afforded plaintiff when defendants were allied and, in fact, presented a coordinated and mutually supportive defense?

C.   Did the trial court abuse its discretion in failing to excuse for cause two potential jurors who were biased against plaintiff and in favor of the defense?

D.   Did the trial court err in failing to permit plaintiff to *voir dire* on the alleged "lawsuit crisis?"

II.   Did the trial court err in instructing the jury that the defendants were presumed to have acted with due care, even though

A.   Plaintiff presented a *prima facie* case of negligence; and

B.   Plaintiff's preponderance burden of proof was properly set forth in other instructions?

III.   Did the trial court err in denying plaintiff's motion *in limine* to exclude references to plaintiff's prior settlements with a non-party and a former party, where defendants did not contend that either of those entities had any proportionate fault with respect to plaintiff's injuries? [1]

The doctors restated the issues in separate briefs. The issues as rephrased by McMillan are illustrative:

A.   Was the jury selection fair?

1.   Was the failure to grant an extra peremptory challenge for the alternate juror error and, if so, was it harmless error?

2.   Did the trial court properly give each defendant three peremptory challenges?

3.   Did the trial court properly refuse to excuse jurors Wasmuth and Brown for cause?

4.   Did the trial court properly restrict voir dire concerning the alleged "lawsuit crisis"?

B.   Did the trial court properly instruct the jury that the defendant doctors were entitled to a presumption of reasonable care which could be overcome by expert testimony?

* Chief Justice at time of oral argument.

1.   The Wyoming Trial Lawyers Association filed an *amicus curiae* brief which addressed the is-  sues regarding *voir dire* on the alleged "lawsuit crisis" and disclosure of settlements under Wyoming's comparative negligence law.

·C. Did the trial court erroneously grant Plaintiff's request to inform the jury of settlements with others, or did the Plaintiff invite error?

In a separate cross-appeal, McMillan raises the following issue:

1. Did the trial court err in issuing its October 31, 1990 Protective Order denying Defendant/Appellant Jon M. McMillan the ability to fully discover the expert opinions and testimony of a treating physician?

Peters raises the following issue in another separate cross-appeal:

1. Did the trial court err in issuing its October 31, 1990 Protective Order denying Defendant/Appellant Stan Peters the ability to fully discover the expert opinions and testimony of a treating physician, Dr. E. Larry McCleary?

## Background

On May 13, 1987, Neal Wardell fell on a rock while he was playing at school. After recess, Neal complained of pain between his shoulder blades and experienced difficulty holding a pencil. School authorities summoned an ambulance. The ambulance transported Neal to Cody's West Park Hospital. At the hospital, Peters, an emergency room physician, and McMillan, an orthopedic surgeon, examined Neal. While he was under the care of McMillan and Peters, Neal underwent numerous radiographic studies. The x-rays failed to demonstrate any apparent fractures, dislocations, or other abnormalities of the cervical spine. Despite the lack of radiographic evidence of an injury, Neal progressively lost neurological functioning. The doctors decided to transport Neal by helicopter to St. Vincent's Hospital in Billings, Montana. Neal arrived at St. Vincent's during the evening hours of May 13, 1987, and was placed into the care of James Johnson, M.D. Neal's condition continued to deteriorate at St. Vincent's, and Neal was transported to Children's Hospital in Denver, Colorado, on May 14, 1987. At Children's Hospital, Neal was treated by Robert Hendee, Jr., M.D. and by E.L. McCleary, M.D. Neal was

released from Children's Hospital as a quadriplegic.

Wardell filed a negligence action against McMillan and West Park Hospital on May 12, 1989. He alleged that McMillan was negligent in failing to immobilize Neal's neck, in performing a range-of-motion test, and in permitting Neal to move about when he knew or should have known that Neal had suffered a spinal cord injury. On November 13, 1989, Wardell filed a separate action against Peters. He alleged that Peters was negligent for substantially the same reasons as he cited in the complaint against McMillan and the hospital. These cases were consolidated for trial by a court order filed on January 19, 1990.

In addition to filing civil actions, Wardell filed a claim with Big Horn County School District No. 1 pursuant to the Wyoming Governmental Claims Act. Wardell alleged that the school district was negligent in failing to maintain a safe playground. The school district and the hospital settled the respective claims alleged against them prior to trial.

Jury selection began on November 13, 1990, and the trial began on November 15, 1990. Wardell presented expert testimony to support his theory that Neal's injuries were proximately caused by negligent medical treatment. The doctors, in turn, presented expert testimony to support their theory that "the die was cast" when Neal fell on the playground; i.e., the fall, and not the subsequent medical care, caused Neal's paralysis. On December 7, 1990, the jury returned a special verdict, finding no negligence by McMillan, Peters, the school district, the hospital, or Dr. Johnson. Wardell appeals.

## Jury Selection
### W.R.C.P. 47(b) [2]

Wardell claims that the trial judge committed reversible error by denying him his right to an additional peremptory challenge to be used against alternate jurors as was required by W.R.C.P. 47(b). Specifically,

2. Revised effective March 24, 1992.

Wardell contends that his right to a fair trial was implicated when he was forced to use his statutory allotment of three peremptory challenges against a panel of fourteen prospective jurors. We agree.

The record discloses that the trial judge informed trial counsel prior to jury selection that fourteen prospective jurors would be seated in the jury box. Trial counsel were to proceed with *voir dire* as if they were qualifying fourteen jurors. Trial counsel, but not the jurors, knew in advance that those individuals seated in positions three and thirteen would be the alternate jurors. Upon being advised of the jury selection process, Wardell objected as follows:

> [COUNSEL FOR WARDELL]: Well, I understand what the Court's doing. Let me say I have an objection insofar as I may be required to use both of my peremptory challenges on people who are going to be alternates, and all the more reason I need more.
>
> THE COURT: That can be possibly true for any party to the case.
>
> [COUNSEL FOR WARDELL]: I see that, Your Honor. But knowing in advance[ ] that three and thirteen will be alternates, I would much prefer to be able to exercise an extra challenge to the alternate because[,] as it is, I am being permitted to use my three statutory challenges on a panel of fou[ ]rteen, when in fact only twelve will most likely try the case.
>
> THE COURT: If I granted that, then I would have to grant each of the other parties the opportunity to do the same thing.
>
> So the objection is noted on the record and overruled.

Wardell again objected to the procedure near the end of the jury selection process:

> [COUNSEL FOR WARDELL]: I am now going to exercise my third peremptory challenge. I am being forced to use it on the alternate, therefore, not getting three peremptory challenges. I am going to exercise it on Mrs. Kaelberer. I also at this time, if I were afforded equal number of defense challenges, would

strike Mr. Daniels, who has been treated by the doctors. I would strike Mrs. Miller, who has been reported to us to have a bias against Mormons, and the Wardells are obviously a Morm[o]n family, and Mr. Klentz, who expressed concern about whether he can be fair to our side.

■ The trial judge erred as a matter of law in overruling Wardell's objection and in denying his request for an additional peremptory challenge. Once the trial judge exercised his discretion to invoke W.R.C.P. 47(b) for the purpose of seating alternate jurors, the parties were entitled to an extra peremptory challenge as a matter of law. The trial judge was afforded no discretion. The plain language of W.R.C.P. 47(b) bore this out:

> (b) *Alternate juror.*—Immediately prior to the selection of the jury, the court *may* direct that one (1) or two (2) jurors in addition to the regular panel be called and impanelled to sit as alternate jurors.... If either one (1) or two (2) alternate jurors are called each party *is entitled* to one (1) peremptory challenge in addition to those otherwise allowed by law. The additional peremptory challenge may be used only against an alternate juror, and the other peremptory challenges allowed by law shall not be used against the alternates.

(Emphasis added.) W.R.C.P. 47(b), by affording an extra peremptory challenge, was designed in part to protect from dilution the litigants' statutory right to have three peremptory challenges in the event the trial judge decided to seat alternate jurors.

The purpose of W.R.C.P. 47(b) was frustrated in this instance. The litigants were forced to make a "Hobson's Choice" not contemplated by W.R.C.P. 47(b): They could disregard W.R.C.P. 47(b) and exercise their statutory allotment of three peremptory challenges against both regular and alternate jurors, or they could use their statutory challenges against only the regular jurors and take the risk that an objectionable alternate would not be called upon to deliberate the case. Wardell chose the former alternative and struck an objection-

able alternate juror with a statutorily allotted challenge. Under the circumstances, we do not fault him for that choice.

■ The doctors do not dispute the fact that the parties were not afforded an extra W.R.C.P. 47(b) challenge. Rather, they argue, among other things, that the objections Wardell made to the trial judge were insufficient to preserve the issue for appeal and that, in any event, a technical violation of W.R.C.P. 47(b) was harmless error absent a specific showing of prejudice.

This Court has often held that, absent plain error, it will not consider an alleged error which was not objected to at trial. *See, e.g., Monn v. State*, 811 P.2d 1004 (Wyo.1991) (rule applied in criminal context); and *Triton Coal Company, Inc. v. Mobil Coal Producing, Inc.*, 800 P.2d 505 (Wyo.1990) (rule applied in civil context regarding jury instructions). W.R.C.P. 46[3] required a litigant to make known to the trial judge, in a timely fashion, the action he requested or his objection to the court's action and his grounds therefor. The purpose of this rule was to inform the trial judge of possible errors so that he could have an opportunity to consider his rulings and to correct them, if necessary. *See* 5A JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 46.02 (2d ed. 1989).

Wardell's objections made to the trial court fulfilled the purpose underlying W.R.C.P. 46. Wardell objected immediately upon learning that the trial judge was going to invoke W.R.C.P. 47(b) for the purpose of seating alternate jurors without affording the litigants an extra peremptory challenge. He objected again just prior to exercising his third statutory peremptory challenge on an alternate juror. Wardell made it abundantly clear that he objected to using one or more of his statutory peremptory challenges on alternate jurors and that he thought he was entitled to have an additional peremptory challenge.

The doctors suggest that Wardell's objections were insufficient in that W.R.C.P. 47(b) was not specifically cited to the trial court. We disagree. Although we encourage counsel to be as specific as possible when they are making objections, we find it ill-advised to apply W.R.C.P. 46 in a ritualistic fashion. We would be exalting form over substance if we were to hold that Wardell's objections in this case were insufficient to preserve the alternate-peremptory-challenge issue for appeal. *See* 9 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2472 (1971).

■ Having decided that the trial court erred and that Wardell's objections were sufficient, we must now decide whether the court's failure to afford an extra peremptory challenge as was required by W.R.C.P. 47(b) warrants reversal under the circumstances of this case. According to W.R.C.P. 61, W.R.A.P. 7.04, and Wyoming case law,[4] error is reversible only when substantial rights to a fair trial have been prejudiced. *See Smith v. Kennedy*, 798 P.2d 832 (Wyo.1990). The appellant is charged with the burden of demonstrating the existence of prejudice. *Id.* He can show prejudice by demonstrating that, ab-

---

3. W.R.C.P. 46 provided:

Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him.

(Revised effective March 24, 1992.)

4. W.R.C.P. 61 provides:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

W.R.A.P. 7.04 provides:

Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

sent the error, a reasonable possibility exists that the verdict might have been more favorable to him. *Id.*

In the instant case, Wardell argues that a substantial right—the right to a fair and impartial jury—was adversely affected by the error below. He contends that the trial judge's failure to allow an extra peremptory challenge affected the composition of the jury. Wardell claims that he would have used his third statutory peremptory challenge on one of three identified regular jurors, who were allegedly biased against his case, had he been afforded an extra W.R.C.P. 47(b) challenge to use on an alternate. Wardell argues that he should not be required to show how the improperly composed jury actually prejudiced his case because to do so would require conjecture and speculation. We agree and hold that the trial court's failure to afford the litigants with an extra peremptory challenge for alternate jurors under W.R.C.P. 47(b) constitutes reversible error when the error is properly preserved at trial and when the denial affects the composition of the jury actually called upon to deliberate the case.[5]

Several considerations persuade us to apply the reversible-error rule. First, W.R.C.P. 47(b) afforded no discretion to the trial judge in granting an extra peremptory challenge to the litigants once he made the decision to seat alternate jurors. *Cf. State v. Jones*, 27 Wyo. 46, 191 P. 1075 (1920) (reversible error to allow prosecution an extra peremptory challenge beyond those mandated by statute). Second, it is axiomatic that all litigants are entitled to a fair trial. The touchstone of a fair trial is the right to have an impartial decision maker. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). When the decision maker is to be a jury, impartiality is achieved in Wyoming through the exercise of challenges for cause and peremptory challenges. *See* Wyo.Stat. §§ 1–11–202 to –203 (1988) and W.R.C.P. 47(b). A trial court's refusal to excuse a juror for cause upon a proper showing of bias or denial of a peremptory challenge afforded by law implicates a litigant's substantial interest in, and right to, impanel an impartial jury. *Cf. Patterson v. State*, 691 P.2d 253 (Wyo. 1984), *cert. denied*, 471 U.S. 1020, 105 S.Ct. 2048, 85 L.Ed.2d 311 (1985) (dilution of defendant's statutory allotment of peremptory challenges by trial court's failure to properly excuse juror for cause held to be reversible error). Third, requiring the complaining party to show the existence of actual prejudice would ask him "to discover the unknowable and to reconstruct what might have been and never was[; i.e.,] a jury properly constituted after running the gauntlet of challenge[s] performed in accordance with the prescribed rule[s] of the game." *Kentucky Farm Bureau Mutual Insurance Company v. Cook*, 590 S.W.2d 875, 877 (Ky.1979). Finally, the law generally disfavors any attempt to invade the internal processes of a decision maker for the purpose of impeaching a verdict. *See* W.R.E. 606.

### *Wyo.Stat. § 1–11–202 (1988)*

Wardell claims that the trial court committed reversible error by granting the allegedly nonantagonistic co-defendants, the doctors, three statutory peremptory challenges each, while affording Wardell only three challenges. Wardell urges that the error allowed the doctors an undue advantage in constructing the jury and denied him the right to a fair trial. While we find no error in the trial court's application of Wyoming law as it stood at the time of its ruling, we feel a more substantive inquiry into, or demonstration of, antagonism will

---

5. The doctors cite *Beard v. Mitchell*, 604 F.2d 485 (7th Cir.1979), for the proposition that the denial of an extra peremptory challenge does not constitute reversible error. In *Beard,* the federal district court allowed the parties only one additional peremptory challenge to exercise against four alternate jurors. F.R.C.P. 47(b) required that the litigants be afforded two extra challenges. The Seventh Circuit Court found that the error was harmless because none of the alternates were called upon to deliberate the verdict. *Beard* is distinguishable from the instant case in that there the court's failure to afford the litigants a full allotment of F.R.C.P. 47(b) challenges did not affect the composition of the jury deciding the case.

be required in subsequent cases.[6]

Section 1-11-202 provides: "In the trial of civil cases in the district courts of this state, each side is allowed three (3) peremptory challenges." In *Distad v. Cubin*, 633 P.2d 167 (Wyo.1981), a case factually similar to this one, the Court was confronted with deciding the meaning of the word "side" for purposes of allocating peremptory challenges. The Court relied upon authority from Texas and Kentucky to hold: "[I]n determining whether multiple defendants constitute one side, consideration must be given the nature of the claim against them and whether the defendants' interests are or may be antagonistic." 633 P.2d at 171. The *Distad* Court found that it was very significant that distinct acts of negligence were alleged against the defendants and that they could each reduce their respective liability by emphasizing the fault of the other. *Id.* The Court went on to state in dicta that, by virtue of Wyoming's comparative negligence scheme, it would be rare that multiple defendants would not have antagonistic interests. *Id.*

In light of *Distad*, we cannot say that the trial court erred in affording three statutory peremptory challenges to each doctor. A separate complaint was filed against each doctor which, although very similar to the other, alleged distinct acts of negligence against each doctor.[7] The trial judge was also aware that this case, like *Distad*, involved allegations of medical mal-

practice and that principles of comparative negligence would apply. Given this state of facts, *Distad*, in effect, dictated the trial judge's determination of the matter.

■ Although the factors identified in *Distad* are to be considered when determining antagonism in the multi-party context, we do not believe that they should necessarily be dispositive. Just because the acts of negligence alleged against multi-party defendants are in some manner distinct and because comparative negligence principles will apply does not *ipso facto* create antagonism between the parties sufficient to justify the allotment of extra peremptory challenges. Case law developed in Texas and Kentucky subsequent to the decisions relied upon by the *Distad* Court is in accord. *See, e.g., Davenport v. Ephraim McDowell Memorial Hospital, Inc.,* 769 S.W.2d 56 (Ky.Ct.App.1988) (narrowly construing *Roberts v. Taylor*, 339 S.W.2d 653 (Ky. 1960)); *Patterson Dental Company v. Dunn*, 592 S.W.2d 914 (Tex.1979) (expanding the scope of inquiry required under *Tamburello v. Welch*, 392 S.W.2d 114 (Tex. 1965)).

■ Anticipating that the question of antagonism will arise in the future, we take this opportunity to further define what constitutes antagonism under § 1-11-202 sufficient to warrant the allotment of extra peremptory challenges among multi-party defendants.[8] Section 1-11-202 starts from

---

6. In stark contrast to the previous issue, a plethora of case law exists regarding the propriety and effect of allowing extra peremptory challenges in the multi-party context. *See generally* Deborah F. Harris, Annotation, *Distribution and Exercise of Peremptory Challenges in Federal Civil Cases Under 28 USCS § 1870,* 50 A.L.R.Fed. 350 (1980); Donald E. Evins, Annotation, *Jury: Number of Peremptory Challenges Allowable in Civil Case Where There Are More Than Two Parties Involved,* 32 A.L.R.3d 747 (1970); and Annotation, *Effect of Allowing Excessive Number of Peremptory Challenges,* 95 A.L.R.2d 957 (1964).

7. The acts of negligence alleged against the doctors were identical with the exception that McMillan was alleged to have been negligent by "putting Neal Wardell's neck through a range of motion and in applying vertical pressure to his spinal cord," whereas Peters was alleged to have

"negligently examined and manipulated Neal's neck."

8. The Wyoming Supreme Court approved an amendment to W.R.C.P. 47, effective March 24, 1992, which, in addition to § 1-11-202, addresses the allocation of peremptory challenges in the multi-party context. W.R.C.P. 47(c) now reads as follows:

   (c) Each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the making of challenges or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly.

The new rule adopts the law applicable to the federal courts. *See* 28 U.S.C. § 1870 (1988). The new rule does not alter our position that antagonism must be shown among multi-party defendants in the single-party plaintiff/multi-

the premise that each "side" to a controversy is entitled to an equal number of peremptory challenges. "Side," as that term is understood in the context of litigation, means "litigant or a group of litigants having essentially common interests." *Patterson Dental Company*, 592 S.W.2d at 917. Multi-party defendants constituting only one "side" to a controversy are thereby entitled to only three peremptory challenges under Wyoming law, unless their interests are antagonistic. *Distad*, 633 P.2d 167; *Rivermeadows, Inc. v. Zwaanshoek Holding and Financiering, B.V.*, 761 P.2d 662 (Wyo.1988).[9] Multi-party defendants' interests are antagonistic when a good-faith controversy exists, vis-a-vis each other, over an issue of fact which the jury will decide. *See Patterson Dental Company*, 592 S.W.2d at 918. When such a controversy exists, the defendants constitute separate "sides" within the meaning of § 1–11–202 and are entitled to have additional peremptory challenges. This result is justified by the rationale that certain of the extra challenges will be used to select a jury for the case against the other defendant, rather than against the plaintiff. *See* Daniel J. Sheehan, Jr. & Cynthia C. Hollingsworth, *Allocation of Peremptory Challenges Among Multiple Parties*, 10  St. Mary's L.J. 511, 530 (1979).

When, on the other hand, no good-faith controversy exists between multi-party defendants and they are yet awarded extra peremptory challenges, the single-party plaintiff is placed in a distinct tactical disadvantage. The multi-party defendants, having no motive to exercise their additional challenges against a co-defendant, are able to pool their challenges against the plaintiff. As we have previously recognized, peremptory challenges are of substantial importance in constructing a fair and impartial jury. Theoretically, peremptory challenges may be used in an arbitrary and capricious manner. In practice, however, a party exercises peremptory challenges to reject jurors perceived to be unsympathetic to his case. To allow nonantagonistic, multi-party defendants a two-, three- or four-to-one advantage in the exercise of peremptory challenges affords them undue influence over the composition of the jury and implicates the single-party plaintiff's right to a fair trial.

■ In light of the foregoing, we hold that, prior to allotting peremptory challenges under § 1–11–202, the trial judge should consider all relevant circumstances to determine whether a good-faith controversy exists among multi-party defendants regarding an issue of fact which the jury will decide. It would be incumbent upon multi-party defendants seeking additional peremptory challenges to assist the trial judge in making this determination. An illustrative, but not exhaustive, list of factors to be considered would include: (1) whether separate acts of misconduct were alleged against the defendants; (2) whether comparative negligence principles applied to the case; (3) the type of relationship among the defendants; (4) whether cross-claims or third party complaints had been filed and the positions taken therein; (5) information disclosed by pretrial discovery; and (6) representations made by the parties. *See Davenport*, 769 S.W.2d 56; *Patterson Dental Co.*, 592 S.W.2d 914; *Rivermeadows, Inc.*, 761 P.2d 662; and *Distad*, 633 P.2d 167.

### *Wyo.Stat. § 1–11–203 (1988)*

Wardell contends that the trial court erred in failing to excuse jurors Wasmuth

---

party defendant context prior to the allotment of additional peremptory challenges. The new rule may, however, afford the trial judge more discretion over how many extra peremptory challenges are appropriate under the circumstances and over how they should be exercised.

**9.** In *Rivermeadows, Inc.*, a case not involving negligence, the Court began to expand the scope of the trial court's inquiry under *Distad* for the purpose of determining antagonism among codefendants. The *Rivermeadows, Inc.* Court af-

firmed the trial court's determination that Albrecht and his Wyoming corporation, Rivermeadows, Inc., were not antagonistic and not separately entitled to a statutory allotment of peremptory challenges. The Court examined pretrial positions taken by Albrecht and Rivermeadows, Inc. to determine that the parties, through common counterclaims, cross-claims, and motions, chose to assert an allied or tandem defense.

and Brown for cause under § 1–11–203. Wardell claims that the jurors were legally prejudiced against his case and argues that the trial court's refusal to excuse them implicated his right to a fair trial by forcing him to expend two peremptory challenges to remove them from the jury panel.

We perceive little need to address this issue on appeal in light of our decision to reverse this case on other grounds and the unlikely event that Wasmuth and Brown will again be called upon as potential jurors. We have also recently addressed the trial court's role in assessing challenges for cause under Wyo.Stat. § 7–11–105 (1987), which adopts by reference § 1–11–203. *See, e.g., Schwenke v. State,* 768 P.2d 1031 (Wyo.1989); and *Summers v. State,* 725 P.2d 1033 (1986).

### "Insurance Crisis"

Wardell's final contention regarding the jury selection process is that the trial court abused its discretion by denying his pretrial motion "to question potential jurors concerning advertising, newspaper articles, editorials, and the like with respect to the alleged 'insurance crisis', the alleged 'medical malpractice crisis', and alleged 'lawsuit abuse.' "[10] Wardell claims that the trial judge's undue restriction on the scope of *voir dire* adversely affected his right to select a fair and impartial jury. We disagree.

Trial judges are charged with the duty of seeing that a jury of competent, fair, and impartial persons is impaneled. *Redwine v. Fitzhugh,* 78 Wyo. 407, 329 P.2d 257 (1958). To this end, the scope and extent of *voir dire* are generally within the discretion of the trial judge. *See Barnette v. Doyle,* 622 P.2d 1349 (Wyo.1981). The object of *voir dire* is to afford litigants an opportunity to explore whether prospective jurors have such biases and prejudices as would interfere with their responsibility to fairly decide a case. *Schwenke,* 768 P.2d at 1033. A trial court abuses its discretion when it limits the scope of *voir dire* in a

manner which is unreasonable under the circumstances. *Smith v. State,* 773 P.2d 139 (Wyo.1989).

This Court has never addressed the issue of whether it is appropriate to question prospective jurors regarding the prejudicial effects of the alleged "insurance crisis" campaign. We have, however, addressed a somewhat analogous issue. In *Eagan v. O'Malley,* 45 Wyo. 505, 21 P.2d 821 (1933), the Court held that a plaintiff was entitled in good faith to *voir dire* prospective jurors regarding their interest in or connection with insurance carriers which might become secondarily liable for any judgment entered against the defendant. The Court recognized that ordinarily a trial judge should guard against counsel's attempts to inject the notion into the jury selection process that defendants carry liability insurance. 45 Wyo. at 510, 21 P.2d 821. The Court reasoned that such knowledge was generally irrelevant and that it could taint the jury's consideration of the merits of the case, both as to negligence and as to the amount of damage. *Id.* The Court, however, justified its holding by acknowledging that litigants should be given a reasonable opportunity to explore legitimate sources of juror bias for the purpose of selecting a fair and impartial jury. 45 Wyo. at 511, 21 P.2d 821. The Court concluded: "The rule should be, as we think, that when counsel's conduct and his questions in the case are fairly conducive to the accomplishment of a legitimate end in the proceedings, if, incidentally, prejudice results therefrom to the adverse party, it may not be avoided." 45 Wyo. at 510, 21 P.2d 821. The Court went on to note that the scope of inquiry should be narrowly drawn to protect the defendant's interest by not having the existence of insurance unduly emphasized. 45 Wyo. at 509–13, 21 P.2d 821. The Court indicated that only when the sanctioned inquiry was answered in the affirmative could further questions be asked of prospective jurors regarding their interest in or connec-

---

**10.** The motion, with the supporting brief and exhibits, constitutes an entire volume of the record.

tion with a liability carrier. 45 Wyo. at 512, 21 P.2d 821.

Sister states which have considered the propriety of allowing a *voir dire* inquiry regarding "insurance crisis" propaganda have come to varying conclusions.[11] Of them, we find the approach adopted in *Borkoski v. Yost*, 182 Mont. 28, 594 P.2d 688 (1979), to be persuasive and most in line with *Eagan*. In *Borkoski*, the Montana Supreme Court held that, upon a proper showing of possible prejudice, limited good-faith questioning regarding the prejudicial effect of "insurance crisis" propaganda should be allowed.[12] 594 P.2d at 694. The *Borkoski* court found that the plaintiff's attorney made a proper showing of potential prejudice by demonstrating that the very insurance company involved in the case had been actively engaged in a national advertising campaign which was both designed to prejudice potential jurors against personal injury plaintiffs and contemporaneous in time to the drawing of the jury panel. *Id.* Under those circumstances, the Montana Supreme Court held that either of two preliminary questions would be appropriate: (1) whether the prospective jurors heard or read anything which might affect their ability to sit as impartial jurors; or (2) whether the prospective jurors regularly read any magazines or newspapers in which it had been demonstrated that the insurance advertisements or articles appeared. 594 P.2d at 695. The Montana Supreme Court cautioned that only in the event an affirmative response were received to one of the preliminary questions would counsel be entitled to ask limited follow-up questions to determine whether the juror believed the advertising and whether it would interfere with the juror's ability to render a fair and impartial verdict. 594 P.2d at 694.

We feel that the foundation prerequisites outlined in *Borkoski* strike an appropriate balance between plaintiff counsel's desire to discover legitimate sources of juror bias and defense counsel's interest in keeping the topic of insurance out of the courtroom. Applying *Borkoski* to the instant case, we conclude that Wardell's pretrial motion and supporting exhibits, although comprehensive, failed to demonstrate that the alleged "insurance crisis" campaign had been executed in such a pervasive and contemporaneous fashion as to create a significant source of prejudice in Park County jurors. We hold that the trial judge did not abuse his discretion by denying Wardell's motion to *voir dire* prospective jurors regarding "insurance crisis" propaganda.

### Due Care Instruction

■■ Wardell contends that the trial court committed reversible error in giving the following instruction over his objection:

The defendants rendered medical services to the plaintiff, Neal Wardell. Each defendant is entitled to the benefit of certain presumptions, and in this connection you are instructed as follows:

1. The law presumes that each defendant possessed reasonable knowledge and skill according to medical standards and that in the service undertaken and rendered by him, he discharged his full legal duty to the patient and exercised reasonable care, prudence and foresight in applying his skill and learning.

2. However, this presumption is disputable and may be overcome only by expert testimony which, taken to-

---

**11.** For an overview of the various approaches taken, see Joanne Rhoton Galbreath, Annotation, *Propriety and Prejudicial Effect of Trial Counsel's Reference or Suggestion in Medical Malpractice Case that Defendant Is Insured*, 71 A.L.R.4TH 1025 at §§ 7 & 8 (1989); and Annotation, *Admissibility of Evidence, and Propriety and Effect of Questions, Statements, Comments, Etc., Tending to Show that Defendant in Personal Injury or Death Action Carries Liability Insurance*, 4 A.L.R.2D 761 (1949).

**12.** For recent cases adopting identical or similar positions, *see, e.g., Sutherlin v. Fenenga*, 111 N.M. 767, 810 P.2d 353 (App.1991); *Babcock v. Northwest Memorial Hospital*, 767 S.W.2d 705 (Tex.1989); and *Doe v. Hafen*, 772 P.2d 456 (Utah Ct.App.), *cert. granted*, 789 P.2d 33 (Utah 1989).

gether with other evidence, reasonably justifies a contrary conclusion.

3. This presumption continues throughout the trial unless and until the presumption is overcome.

Wardell argues, among other things, that the trial court, by instructing the jury as to both Wardell's burden of proof and the physicians' presumption of due care, misled the jury into believing that Wardell had a double burden of proving his case. We agree that the trial court erred in giving the due-care instruction. We do not, however, reach the further issue of whether the error warrants reversal because of our decision to reverse this case on other grounds.

The doctors rely primarily upon a statement extracted from *Harris v. Grizzle*, 625 P.2d 747 (Wyo.1981), to support their contention that the due-care instruction accurately reflects Wyoming law. In *Harris*, the Court stated: "A physician or surgeon is presumed to have carefully and skillfully treated or operated upon a patient." 625 P.2d at 753. Taken out of context, this statement, along with similar statements made in prior cases, would appear to support the instruction given in this case. *See Smith v. Beard*, 56 Wyo. 375, 110 P.2d 260 (1941); and *Rosson v. Hylton*, 45 Wyo. 540, 22 P.2d 195 (1933).

*Harris, Smith,* and *Rosson* were all medical malpractice cases wherein the plaintiffs were appealing either an adverse summary judgment or a directed verdict. The Court in each case affirmed the lower court's ruling on the basis of the plaintiff's failure to establish by competent evidence a prima facie case of professional negligence. A careful reading of the cases discloses that, in each instance when the alleged presumption of due care was mentioned, the Court was merely attempting to emphasize the burden of proof placed upon a plaintiff in a medical malpractice action. The real point the Court was making in each instance was that a presumption of negligence does not exist merely because unfavorable results follow medical treatment. The Court did not intimate in any of the cases that it intended to create an evidentiary presump-

tion of due care for physicians upon which a jury should be instructed. *Harris*, 625 P.2d 747; *Smith*, 56 Wyo. 375, 110 P.2d 260; *Rosson*, 45 Wyo. 540, 22 P.2d 195.

Addressing a similar instruction, an Arizona court captured the irony of literally interpreting language similar to that found in *Harris:*

If the quoted language is intended to create a presumption in favor of a defendant physician, it is a strange species of presumption indeed. It does not fit the typical description of a presumption in a civil case—that is, a rule that shifts the burden of producing evidence to the party against whom the presumption operates. Rather, "this presumption" appears to do no more than merely restate the familiar rule that the plaintiff has the burden of proving the defendant negligent.

*Gaston v. Hunter*, 121 Ariz. 33, 588 P.2d 326, 348 (Ct.App.1978) (citations omitted). Accordingly, we view this alleged due-care presumption as being merely the flip side of the plaintiff's burden of proof in a medical malpractice case. As stated by McMillan: "The burden of proving 'that the nonexistence of the presumed fact [i.e., due care] is more probable than its existence,' is the same as the burden of proving defendants' negligence 'by a preponderance of the evidence.'" Consequently, once the jury has been adequately instructed on the plaintiff's burden of proof in a case, it is of no avail to further instruct the jury as to the alleged presumption of due care. To do so would serve only to confuse the jury. *See id.; Richmond v. A.F. of L. Medical Service Plan of Phil.*, 421 Pa. 269, 218 A.2d 303 (1966); and *Peacock v. Piper*, 81 Wash.2d 731, 504 P.2d 1124 (1973); *but see Crumbley v. Wyant*, 188 Ga.App. 227, 372 S.E.2d 497 (Ct.App.1988).

A review of the jury instructions given in this case discloses that the jury was adequately instructed regarding the plaintiff's burden of proof. That being the case, we perceive no reason why physicians, to the exclusion of everyone else, are entitled to a due-care instruction in a negligence case. *Cf. Hoem v. State*, 756 P.2d 780 (Wyo.1988)

(Wyoming Medical Review Panel Act held unconstitutional on equal protection grounds). The trial court erred by so instructing the jury.

### Disclosure of Settlements

█ Wardell finally contends that the trial court erred by ruling that Wyoming's comparative negligence law required the pretrial settlements with the hospital and the school district to be disclosed to the jury. The doctors counter that Wardell should not be heard to complain because he invited the alleged error; i.e., Wardell insisted that the jury be informed of either nothing or everything about the settlements. We agree with Wardell and disagree with the doctors.

We do not believe that the disclosure of settlements is required under Wyoming's comparative negligence law. The relevant statutory section provides in pertinent part:

> (b) The court may, and when requested by any party shall:
>
> (i) ....
>
> (B) Inform the jury of the consequences of its determination of the percentage of fault.

Wyo.Stat. § 1-1-109(b)(i)(B) (1988). This language has been interpreted in practice to require that the jury be informed (1) that a plaintiff will not recover any damages if he is found to be more than fifty percent at fault, and (2) that each defendant is liable for only that portion of the total damage award which corresponds to his percentage of fault. *See* Wyoming Civil Pattern Jury Instructions 10.01A and 10.03A (1988). We believe that § 1-1-109(b)(i)(B) is satisfied once a jury receives instruction on the points outlined above. The jury should then understand the consequences of attributing fault under Wyoming's comparative negligence law. The admission of settlement evidence is not necessary to this understanding. Therefore, whether or not settlement evidence is to be admitted in a particular case must be determined under the Wyoming Rules of Evidence. We hold that the trial court erred in ruling that disclosure of settlements is required by Wyoming's comparative negligence law.

█ We have previously recognized that, under the doctrine of invited error, a party may not complain of action which he induced the trial court to take. *Thatcher & Sons, Inc. v. Norwest Bank Casper, N.A.*, 750 P.2d 1324 (Wyo.1988). The key to determining whether this rule of law applies is identifying the party who "induced" the allegedly erroneous action. The record discloses that Peters requested that the settlements be disclosed to the jury. Wardell's pretrial posture was that no mention should be made of the settlements. It was only after the trial court ruled to allow disclosure of the settlements that Wardell insisted that, to prevent juror speculation, the jury also be informed regarding the settlement amounts. The doctrine of invited error does not apply to Wardell under these circumstances.

### Discovery

█ The doctors claim on cross-appeals that the trial court abused its discretion by issuing a protective order which prevented them from deposing one of Neal's treating physicians, Dr. McCleary, regarding his expert opinion on the issues of standard of care and causation. The protective order limited the scope of inquiry to the factual circumstances relating to Neal's condition and treatment at Children's Hospital. The doctors assert, however, that they had reason to believe Dr. McCleary's expert opinions would be favorable to their cases. They argue that his opinions should be discoverable because Wardell waived the patient-client privilege by filing suit. The trial court did not abuse its discretion under the circumstances of this case.

█ W.R.E. 501 provides in pertinent part: "Except as otherwise required by constitution or statute or by these or other rules promulgated by the Supreme Court of Wyoming, the privilege of a witness ... shall be governed by the principles of the common law." The physician-patient privilege is not recognized in the common law of Wyoming. *See CP v. Laramie County Department of Public Assistance and Social Services (Parental Rights of PP)*, 648 P.2d 512 (Wyo.1982). Rather, the privilege

is established and defined by Wyo.Stat. § 1–12–101 (Supp.1992), which provides in pertinent part:

> (a) The following persons shall not testify in certain respects:
>
>> (i) ... [A] physician concerning a communication made to him by his ... patient in that relation, or his advice to his ... patient. The ... physician may testify by express consent of the ... patient, and if the ... patient voluntarily testifies the ... physician may be compelled to testify on the same subject.

Section 1–12–101 by its express terms protects only confidential communications made by a patient to his physician and advice given by a physician to his patient. Similar privilege statutes are generally interpreted as extending the privilege to all information secured by a doctor through observation, examination, or conversation with the patient, so far as it is relevant. EDWARD W. CLEARY, MCCORMICK ON EVIDENCE § 100 (3d ed. 1984). The policy underlying such a statutory privilege is to encourage full and frank disclosure between a patient and his doctor for the purpose of effective diagnosis and treatment. *See* 61 AM.JUR.2D *Physicians, Surgeons, and Other Healers* § 169 (1981). When a patient places his physical or mental condition into contest, the physician-patient privilege is waived to the extent that it is relevant to the controversy. *See Frias v. State,* 722 P.2d 135 (Wyo.1986). Under such circumstances, the patient can no longer expect to silence his physician relating to the subject matter of the litigation. *See* MCCORMICK ON EVIDENCE, *supra* at § 103. The waiver, however, is not without boundaries. The physician may not discuss the patient's condition and treatment with the world at large, but he is bound to disclose the relevant circumstances only within the confines of the adversarial process. *See* 61 AM.JUR.2D, *supra.*

Wardell concedes that he waived the physician-patient privilege by filing suit. He contends, however, that the waiver extended to only factual information relating to Neal's condition and treatment. Wardell apparently interprets the statutory language, "[t]he ... physician may testify by express consent of the ... patient," to mean that a physician may not offer anything but factual testimony absent the express consent of the patient. We do not read the statute so broadly. The language, when read with the rest of the statute, refers only to the circumstances under which a physician may disclose patient confidences when a waiver of the privilege has not been implied by law. The plain language of the statute does not prohibit a treating physician from expressing his expert opinion regarding issues placed into contest by his patient.

Wardell argues alternatively that as a matter of public policy this Court should protect the "special relationship" which exists between a patient and his physician by prohibiting the physician from expressing an expert opinion adverse to the patient's interests. Wardell claims that a physician has a fiduciary duty not to act contrary to his patient's best interests.

W.R.C.P. 26(b) [13] governed the scope of discovery in civil litigation and provided: "Unless otherwise limited by order of the court in accordance with these rules, ... [p]arties may obtain discovery regarding any matter, not privileged, which is relevant ... [or which] appears reasonably calculated to lead to ... admissible evidence." As is evident, few restrictions are placed upon the scope of civil discovery. Only privileged or completely irrelevant information is off limits, unless the court orders otherwise. In the instant case, we have already determined that Dr. McCleary's expert opinions were not privileged, and it was conceded that they were potentially relevant. Our question then becomes whether the protective order issued by the trial court constituted an abuse of discretion under the rules governing discovery. *See Cubin v. Cubin,* 685 P.2d 680 (Wyo. 1984).

**13.** Revised effective March 24, 1992.

W.R.C.P. 26(c) [14] provided that, upon a motion for good cause shown, a trial judge could issue any order required by justice "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The record reveals that Wardell moved the trial court to issue a protective order forbidding the doctors from deposing Dr. McCleary regarding, among other things, his expert opinions on the applicable standard of care and the issue of causation. The trial court issued the requested order on the grounds that it furthered the ends of justice and that the information sought was privileged.

■ Although Dr. McCleary's testimony was not privileged, we do believe that the protective order was issued in the interest of justice. Our reasons are several. First, Dr. McCleary was not designated as a trial expert by Wardell at the time the protective order was sought, and, therefore, it was unnecessary to depose him regarding his expert opinions for purposes of cross-examination. *See* W.R.C.P. 26(b)(4)(A). Second, Dr. McCleary was never "retained or specially employed" by Wardell in anticipation of trial, so his expert opinions were not discoverable pursuant to W.R.C.P. 26(b)(4)(B). Third, as a general proposition, we do not believe that a treating physician, who may feel that it is ethically inappropriate to testify as an expert witness against a patient, should be unnecessarily forced to do so.[15] A contrary position would needlessly pit physician against patient, potentially destroying a mutually beneficial relationship. Finally, the doctors had numerous expert witnesses to support their theory of the case. The apparent and primary reason they sought Dr. McCleary's testimony was in the hopes that they could argue before the jury that Wardell's own physician said no one was at fault. The prejudicial effect of such testimony or argument may well outweigh its need in this case. We hold that, under the circumstances, the trial judge did not abuse

his discretion by issuing the protective order.

## Conclusion

The trial court committed reversible error by failing to afford the parties an extra peremptory challenge as was required by W.R.C.P. 47(b).

Reversed and remanded for a retrial consistent with this opinion.

CARDINE, J., files a specially concurring opinion.

URBIGKIT, J., files an opinion concurring in part and dissenting in part, and GOLDEN, J., generally concurs and joins in that portion of Justice Urbigkit's opinion dealing with the discovery issue on cross-appeal.

CARDINE, Justice, specially concurring.

I concur in the result reached in the court's opinion but not in the reasons therefor. Appellant Wardell is entitled to a new trial because he was allowed three peremptory challenges while appellees' side of the case was allowed six and because the trial court refused him an extra peremptory challenge for the impanelling of alternate jurors, all in violation of W.R.C.P. 47(b). The court's discussion beyond the alternate juror peremptory challenge question is advisory and unnecessary to the decision in this case. However, having undertaken discussion of these questions, two of the court's gratuitous holdings strike me as incorrect.

## PEREMPTORY CHALLENGES

The court's analysis of the number of peremptory challenges to be awarded multiple defendants is incorrect. Thus, I refuse to accept both its dicta applicable to future cases and its resolution of the issue as applied to this case.

---

**14.** *See supra* note 13.

**15.** When briefing this issue, the parties relied primarily upon cases which addressed whether a treating physician who *voluntarily* becomes a defense expert should be allowed to testify at

trial. The facts of the instant case do not raise this issue for our review. It is interesting to note, however, that the courts are decisively split.

The majority opinion concludes that Wardell received a fair trial, even though the doctors each were given three peremptory challenges, for a total of six, to Wardell's three challenges. It cites *Distad v. Cubin*, 633 P.2d 167 (Wyo.1981), in support of this decision. *Distad* was correct, insofar as it analyzes the problem of multiple defendant peremptory challenges by inquiring into whether the defendants' interests are "antagonistic" to one another. However, *Distad* was incorrect when it held or implied that antagonism can be *presumed* between multiple tort defendants because of their conflicting interests in the allocation of negligence percentages, stating: "[t]he result of Wyoming's comparative negligence design is that very seldom will multiple defendants not have antagonistic interests." *Distad*, 633 P.2d at 171. For reasons I will state, it is apparent that the presumption is wrong and that *Distad* should be overruled as to the presumption of adversity among defendants.

Giving each of multiple defendants the statutory maximum number of challenges allows the defendants to exert inordinate influence in, and to dominate, the jury selection process. *Moore v. Jenkins*, 304 S.C. 544, 405 S.E.2d 833, 835 (1991). To allow such an imbalance permits multiple defendants to effectively control jury selection. *Layne v. GAF Corp.*, 42 Ohio Misc.2d 19, 537 N.E.2d 252, 254 (Com.Pl.1988). A disproportionate number of strikes granted the defendants prevents the plaintiff from meaningfully asserting his right to peremptory challenges, which is incident to his right to jury trial. *George v. Bergen Pines County Hosp.*, 217 N.J.Super. 548, 526 A.2d 293, 295 (L.1987).

*Distad* purports to be based on Texas precedent. However, as the majority recognizes, language in the landmark case of *Patterson Dental Co. v. Dunn*, 592 S.W.2d 914 (Tex.1979), and subsequent decisions of the Texas courts demonstrate that even they would not sanction a rule as extreme as that suggested by *Distad*. The *Distad* court found antagonism in the mere fact that under Wyoming's comparative negligence scheme, each defendant's comparative negligence could be used to reduce

that of the other defendant(s). As will be seen, this factor could not, in and of itself, justify the award of additional peremptory challenges to a defendant under current Texas law.

The Texas Supreme Court stated the following in *Patterson:*

> Antagonism does not exist because of differing conflicts with the other side; *e.g.,* when a plaintiff sues several defendants alleging different acts or omissions against each defendant. Antagonism would exist, however, if each of the defendants alleged that the fault of another defendant was the *sole* cause of plaintiff's damage. The existence or non-existence of cross-actions or third-party actions is not determinative.

*Patterson,* 592 S.W.2d at 918 (citations omitted; emphasis added).

At the time *Patterson* was written, Texas had in place a comparative negligence/contribution among joint-tortfeasors statute. *See* 1973 Tex.Gen.L. ch. 28, §§ 1, 2(a). Thus, in cases with multiple defendants, each defendant had an interest in seeing his codefendants charged with responsibility for a greater percentage of the harm suffered by the plaintiff. Nevertheless, the court held that antagonism existed only when each of the defendants pointed to the others as the *sole* cause of the harm.

Subsequent cases have followed the rules set out in *Patterson.* In *American Cyanamid Co. v. Frankson,* 732 S.W.2d 648 (Tex.App.1987), *writ of error refused, n.r.e.,* the court affirmed a jury verdict against a drug manufacturer who challenged the trial court's allocation of peremptory challenges. The court held that the trial court did not abuse its discretion in awarding nine strikes to the plaintiff and nine, cumulatively, to the defendants, even though the manufacturer and the doctor who supplied its product to the plaintiff had filed cross-actions against each other. The court noted that in these actions, neither defendant alleged that the other was the *sole cause* of the plaintiff's injuries.

In *Parker v. Associated Indem. Co.,* 715 S.W.2d 398 (Tex.App.1986), *writ of error*

*refused, n.r.e.,* the trial court allotted ten peremptory strikes to the two defendant insurance companies, and only six to the plaintiffs. The Court of Appeals reversed judgment for the defendants. Although one of the insurance companies had filed a cross-action for indemnity and/or contribution from the other, neither defendant claimed that the other was the sole cause of plaintiffs' damages. The court stated that "[a]ntagonism does not always exist even if the parties on the same side may have different conflicts with the other side. In this case, the defendants centered their defense on the same issue: no insurance coverage * * *." *Parker,* 715 S.W.2d at 401. *See also Lopez v. Foremost Paving, Inc.,* 709 S.W.2d 643 (Tex.1986) (holding that granting extra strikes to defendants was reversible error); *and cf. Lopez v. City Towing Assoc., Inc.,* 754 S.W.2d 254, 258 (Tex.App.1988), *writ of error denied* (stating rule that antagonism exists when each defendant asserts that the other's negligence was the sole cause of the plaintiff's damage).

As the majority also recognizes, *Distad* cited Kentucky precedent which has since been restrictively interpreted. In a recent case, which like this case involved medical malpractice, the Kentucky Supreme Court held that interests of the defendants were not antagonistic where the defendants shared the same theory of the case. *Davenport By and Through Davenport v. Ephraim McDowell Memorial Hosp., Inc.,* 769 S.W.2d 56, 59 (Ky.App.1988). The defendants had cited *Roberts v. Taylor,* 339 S.W.2d 653 (Ky.1960), which this court relied upon indirectly in *Distad,* for the proposition that where defendants in a personal injury case are charged with independent acts of negligence, their interests are almost always antagonistic because of the possibility of convincing the jury that the other defendant was primarily or solely at fault. However, the Kentucky Supreme Court distinguished *Roberts,* stating that:

> The *Roberts* court's actual words were that defendants charged with independent acts of negligence "in most any case of collision of two or more vehicles involving a claim by a passenger" will

mean that the defendants' interests are antagonistic. *Roberts* was a clear-cut, extreme case of antagonistic interests that is inapposite to our facts here.

*Davenport,* 769 S.W.2d at 59.

In short, recent precedent in both Texas and Kentucky does not support the claim in *Distad* that the ability to reduce one defendant's liability under a comparative negligence scheme by pointing the finger at another creates a presumption of adversity between defendants. From these cases I abstract a rule that antagonism does not exist merely because percentages of negligence must be distributed among defendants. Rather, "pointing the finger" must generally rise to a level where each of the defendants claims that the other is the *sole* cause of the plaintiff's injuries. Furthermore, the burden is always on the defendants to clearly demonstrate adversity. Positions taken by defendants in pretrial procedures should supply significant evidence of the relationship between defendants.

The majority proposes a multiple-factor test to replace the presumption contained in *Distad.* While I agree with the factors the majority proposes, I feel it is important to stress that the presence of many or most of them would not necessarily show adversity. The fact that separate acts of misconduct are alleged against the defendants, that comparative negligence principles apply, and that cross-claims or third party complaints have been filed does not necessarily mean that the defendants are adverse. Experience teaches that more often than not each defendant defends against the claim of plaintiff and is reluctant to and rarely does attack the other defendant(s). It is the rare and unusual case in which defendants are found to be truly antagonistic.

Furthermore, I believe the majority fails to take an effective stand as to the defendants' burden of proof on this issue. The majority says "[i]t would be incumbent upon multi-party defendants seeking additional peremptory challenges to assist the trial judge in making this determination." Maj. op. at 1061. I would more clearly

state that the defendants have the burden of *clearly demonstrating* that their interests are adverse. There is no presumption of adversity in favor of defendants; the burden of proof of adversity resides with defendants. Failure to carry the burden must result in an equal number of challenges being given to the plaintiffs' side and the defendants' side of the case.

Contrary to what is said in *Distad*, multiple defendants nearly always have one, overriding aim in common: to establish that *plaintiff* cannot recover for his or her injuries. It is rare that the defendants are so antagonistic that they constitute separate "sides" entitling them to additional peremptory challenges under W.S. 1–11–202. Therefore, I would overrule the presumption of adversity in *Distad*, and hold that there is a presumption that multiple defendants are *not* adverse, and that this presumption can only be overcome if adversity is clearly demonstrated by defendants.

I would apply this rule to the facts of this case. The defendant doctors in this action were not so adverse that extra jury strikes should have been awarded them. Their designations of expert witness testimony indicated that the experts planned to testify that it was the boy's *fall*, rather than another defendant's negligence, which caused his injuries. When Dr. Peters identified his affirmative defenses in his pretrial memorandum, none claimed any negligence by Dr. McMillan. Perhaps the best statement of the defense of *both* defendants is found in Dr. Peters' pretrial memorandum:

> *The defendants* contend * * * that Neal Wardell damaged a spinal cord artery or arteries during the fall in the school yard, either by direct damage during impact, or by vasospasm, which may result from the release of chemicals triggered by the fall. [Emphasis added]

In a pretrial deposition, Dr. McMillan was asked whether he faulted Dr. Peters in any way for what happened to Neal Wardell. He responded "[a]bsolutely not." Defendants' expert witnesses took the same position, that they had either not been asked to render an opinion as to the other doctor's conduct, or that neither doctor could be faulted for what he did or failed to do.

As he began voir dire of the jury panel, counsel for Dr. McMillan informed the jury as follows:

> [T]his child fell in the school yard and as a consequence of that he suffered an injury. Now, therein lies the dispute between *[counsel for plaintiff]'s side of the case and mine*. The dispute will center upon a cause, cause of that injury. [Emphasis added]

McMillan's counsel thus identified his case as being adverse to the plaintiff's but not to Dr. Peters'. As for counsel for Dr. Peters, his position was revealed when he stated at voir dire:

> I am going to tell you that some of the evidence in this case or the evidence that's going to come from the defendants in this case is going to be to the effect that what happened to Neal Wardell happened *without the fault of either of these two gentlemen* * * *. [Emphasis added]

The attorneys for the doctors also cooperated in the voir dire process itself. For example, Doctor McMillan's counsel sought to have a juror excused for cause because of derogatory statements made to him about Dr. McMillan's handling of the accident. It was clear the juror had heard nothing adverse about Dr. Peters. However, counsel for Dr. Peters also asked that the juror be excused for cause. Only plaintiff objected. Had Dr. Peters been truly adverse to Dr. McMillan, his counsel could have joined plaintiff in seeking to avoid a strike for cause of a potential juror who had heard adverse information about Dr. McMillan. There were numerous other examples of close cooperation between counsel for the defendants during voir dire. They cooperated in requesting challenges for cause, joined in each others' objections to plaintiff's voir dire questions, and even deferred to each other's arguments in chambers. In short, the evidence presented before and during voir dire demonstrates that the doctors were aligned rather than adverse. They were not entitled to

extra strikes. I would apply the principles and presumptions I have outlined here, to hold that plaintiff did not receive a fair trial because of the allocation of jury strikes.

### INSURANCE CRISIS

I also disagree with the majority's disposition of the "insurance crisis" issue. The majority holds, following *Borkoski v. Yost,* 182 Mont. 28, 594 P.2d 688 (1979), that a plaintiff concerned over adverse publicity about the so-called "insurance crisis," may ask one of two preliminary questions: "(1) whether the prospective jurors heard or read anything which might affect their ability to sit as impartial jurors; or (2) whether the prospective jurors regularly read any magazines or newspapers in which it had been demonstrated that the insurance advertisements or articles appeared." Maj. op. at 1063. Only if one of these questions is answered in the affirmative may the attorney follow up with other questions.

The experienced trial advocate can testify that the first of these questions is useless. It so strongly suggests a negative response that it is unlikely any juror would answer it affirmatively. No juror wants to admit that he or she may be "prejudiced" or "not impartial." This restriction upon voir dire is made more serious by the fact that once a negative answer is made, the majority says the inquiry is over. The lawyer is not allowed to probe further, even to allow a juror to qualify the negative answer by admitting, for example, that he or she *has* read insurance company propaganda but still thinks he or she can be impartial.

The question is also much too vague to lead inevitably to fruitful inquiry on the insurance crisis issue. Since it does not indicate what *kind* of hearing or reading is sought, a juror asked this question would probably not make the connection between insurance company advertising and his vote in this *specific* case. This vagueness could not be clarified by the attorney because, again, no follow-up questions would be allowed after a negative response.

The second question the majority suggests is a little more specific, but is also flawed. It assumes that only a regular reader of one of the target periodicals will have been affected by the advertising or stories on the so-called "insurance crisis." However, the juror who does not regularly consult a *primary* source of insurance company advertising or articles on the "insurance crisis" may nevertheless be aware of it. The origin of his or her awareness may be so obscure that it could never be directly traced to a particular magazine or newspaper. (An ad campaign on such a controversial topic which had no such secondary effect would be weak indeed!)

To give an example of how this information influences secondary sources, consider the anecdotal or statistical information on the "tort crisis" which has become a part of American dialogue. The insurance companies, to bolster their campaign, have chosen to present inflammatory examples and misleading statistics regarding jury verdicts. *See e.g.,* W. James Kronzer, *Jury Tampering–1978 Style,* 10 St. Mary's L.J. 399, 409 (1978). Naturally, some of the more outrageous of these examples have become popular among commentators on the American scene and have achieved wide circulation outside of their original source.

Here is part of a letter, dated February 23, 1986, from a private citizen to the Laramie, Wyoming *Boomerang:*

Many competent professionals literally are being driven out of their fields by the unpredictable liability in their work, professionals often needed badly by the general public.

What is the cause? Who is the culprit? Here are three cases detailed in July 15 '85 "Forbes" which may help clarify the point:

* A 41–year–old bodybuilder entered a footrace with a refrigerator strapped to his back to prove his prowess. During the race, one of the straps came loose and the man was injured. He sued the maker of the strap. Jury award: $1 million.

* Two Maryland men decided to dry their hot air balloon in a commercial laundry dryer. The dryer exploded, injuring them. They won $885,000 in damages from American Laundry Machinery which manufactured the dryer.

* An overweight man with a history of coronary heart disease suffered a heart attack while trying to start a Sears lawnmower charging that too much force was required to yank the mower's pullrope. A jury in Pennsylvania awarded him $1.2 million plus $550,000 for delays in settling the claim.

Isolated cases of absurdly generous awards? Far from it.

An attorney who asked jurors if they regularly read Forbes magazine would not "pick up" readers of this letter to the editor. More ominously, a prospective juror might never have read one word about the insurance crisis, but might have a friend or spouse or employer who had shared strong feelings about it with the juror. Or he might know someone in one of the professions which has suffered insurance cancellations or premium increases and has been told by his or her insurer that it is due to the "lawsuit crisis." As the information explosion continues, there are more and more sources of information available to the average citizen. Neither of the majority's suggested questions would necessarily catch these potential sources of bias.

Can we really ask a plaintiff's attorney to find every printed reference to the "insurance crisis" which a prospective juror may have read, and ask the juror about his or her regular readership of that *individual* source? If so, I fear we are requiring the attorney to capture the sea in a sieve.

In short, each of the questions the majority suggests hobbles plaintiff's ability to discover the essential factor: whether the juror knows of or has attitudes, feelings, or opinions about an "insurance crisis" which may affect his or her ability to render a fair and impartial verdict. Therefore, I would allow, at a minimum, the attorney to ask the more basic questions which would disclose the knowledge, opinions, and feelings of jurors upon any subject that might affect the juror (result in bias or prejudice) in arriving at a verdict in the case. This may include knowledge of claimed need for "tort reform" or "insurance crisis" if the juror knows of it. If the juror has no knowledge of these subjects, the questioning is at an end. And of course the correct

question is not: "having heard of tort reform, are you prejudiced against a plaintiff who sues to recover damage?" The answer will always be "no," and no information of value is obtained. The correct question is: "how do you feel about tort reform?" The question is open-ended. The juror's answer must be more than yes or no. The juror will answer that question.

The *Borkoski* court suggests the following which, although not the best questions designed to elicit information, are, nevertheless, acceptable:

> [A]n attorney may inquire whether a prospective juror *has heard or read anything* to indicate that jury verdicts for plaintiffs in personal injury cases result in higher insurance premiums for everyone; if so, whether the prospective juror believes such materials; and if so, whether that belief will interfere with the juror's ability to render a fair and impartial verdict.

*Borkoski*, 594 P.2d at 694 (emphasis added).

It is said that subjects such as the need for tort reform, excessive verdicts, the insurance crisis, and others are subjects jurors will discuss in the jury room. The question then is whether counsel would rather they be discussed openly, in court, so that each counsel may assess their impact and effect on a prospective juror's ability to fairly decide the case, or would counsel rather not know the answers? Some counsel are afraid to hear or unable to deal with the answers. But how otherwise can attorneys and litigants effectively exercise their peremptory challenges? I would have allowed Wardell to *voir dire* the prospective jurors on the insurance crisis issue.

URBIGKIT, Justice, concurring in part and dissenting in part, in which GOLDEN, Justice, joins on the issue regarding the trial court's control of discovery as a third concern.

I concur in the decision and in the dispositive opinion except in ancillary regard involving four distinguishable areas. Those differences which do not, however, foreclose concurrence in the result, include: (1) use of prejudicial-partial individual trial ju-

rors; (2) voir dire expansion to establish or foreclose existence of general juror prejudice by institutional advertising campaigns; (3) discovery privilege for the litigant's private physician; and (4) instructional advisement to the jury for them to be informed about the consequence of their verdict, Wyo.Stat. § 1–1–109 (1988).[1]

## A. UNEXCUSED JURORS WHO WERE NOT FAIR AND IMPARTIAL

In consideration of the segment designated "Wyo.Stat. § 1–11–203 (1988)," it is apparent that the two unexcused jurors were in no regard fair and impartial. Our society has sufficient potential jurors that no one with an obvious ax to grind need be included within the decision making group—the constitutionally required impartial jury. Wyo. Const. art. 1, § 10. This record provides compelling evidence of the existence of both the ox and the grindstone.

We know full well the power of prejudice and predisposition in decision making. Our goal must remain as the majority's decision states: "The touchstone of a fair trial is the right to have an impartial decision maker." Maj. op. at 1059 (citing *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984)). *See also Amin v. State*, 811 P.2d 255, 262 (Wyo.1991), Urbigkit, C.J., dissenting; *Lee v. State*, 743 P.2d 296 (Wyo.1987); and *Redwine v. Fitzhugh*, 78 Wyo. 407, 329 P.2d 257 (1958). For a vivid example of juror partiality, see *State v. Cady*, 248 Kan. 743, 811 P.2d 1130 (1991).

## B. VOIR DIRE TO DETERMINE EFFECT DISFAVORING TORT PLAINTIFFS FROM INSTITUTIONAL ADVERTISING CAMPAIGNS CONDUCTED BY THE INSURANCE INDUSTRY

A second area, which in reality reaches the same concern, also requires a diver-

gence for me from the majority. The segment is entitled "Insurance Crisis." Institutional advertising does not just come out of the woodwork or exist for insurance companies to incur expenses to offset profits. See, for informational purposes, *New York Public Interest Research Group, Inc. by Wathen v. Insurance Information Institute by Moore*, 140 Misc.2d 920, 531 N.Y.S.2d 1002 (1988), *aff'd* 161 A.D.2d 204, 554 N.Y.S.2d 590 (1990). Insurance company institutional advertising has at least a dual objective. First, there is a desire to influence legislators. Secondly, and perhaps even more pervasive, is the desire to create an atmosphere of juror predisposition in order to affect the result of jury verdicts. *Id.* at 1012.

I recognize the freedoms guaranteed for press and in advertising by the First Amendment to the United States Constitution and the preclusive guarantees provided to Wyoming citizens by Wyo. Const. art. 1, § 20. Within that recognition of the rights of the insurance industry to attempt preconditioning through crisis advertising, I am not foreclosed from continued interest in requiring fair and impartial decision makers to serve on juries.

The trouble with the discretion application in the majority is to first authenticate the presiding trial judge to be an accomplished mind reader to divine what the jury is thinking and whether they have, individually, achieved preconditioning from the mass media advertising. Without voir dire, the trial judge cannot be factually knowledgeable about the effects of this campaign derived from insurance industry advertising. We, of course, know there is a general effect. The unknown is specificity of what that effect might be on this panel, and more importantly, on the individuals within the panel who will be chosen to

---

**1.** Wyo.Stat. § 1–1–109 states in part:

(b) The court may, and when requested by any party shall:

(i) If a jury trial:

\* \* \* \* \* \*

(B) Inform the jury of the consequences of its determination of the percentage of fault.

render the trial decision. Informed knowledge by the trial judge about the participants in the jury panel is required to provide a basis for any proper exercise of discretion. *See Martin v. State,* 720 P.2d 894 (Wyo.1986).

Properly exercised discretion requires applied reason and attained knowledge of the relevant facts and circumstances. In *Martin,* we reiterated Washington case law regarding discretion which was first stated in *State ex rel. Carroll v. Junker,* 79 Wash.2d 12, 482 P.2d 775, 784 (1971):

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.

The *Junker* court added:

> Where the decision or order of the trial court is a matter of discretion, it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.

*Id.*

In *Rex v. Wilkes,* 4 Burr. 2539, Lord Mansfield long ago said: " 'Discretion, when applied to a court of justice, means sound discretion guided by law. It must be governed by rule, not by humor; it must not be arbitrary, vague, and fanciful, but legal and regular.' " *Tingley v. Dolby,* 13 Neb. 371, 14 N.W. 146, 147–48 (1882). Intrinsic to meet the Lord Mansfield rule, essentially restated by the Washington court in *Junker* and then applied by this court in *Martin,* is access to the facts from which an informed judgment, constituting exercised discretion, can be made. *See In re Schuoler,* 106 Wash.2d 500, 723 P.2d 1103, 1110 (1986) (quoting *Junker,* 482 P.2d at 784), where the court held that discretion is abused when it is " 'exercised on untenable grounds, or for untenable reasons.' " *See also In re Marriage of Tang,* 57 Wash. App. 648, 789 P.2d 118 (1990). "The impartiality of the jurors is a question of fact to be decided by the trial court upon the basis

of proper questioning." *Jahnke v. State,* 682 P.2d 991, 1000 (Wyo.1984).

Recognition of the relevant facts to make an informed judgment is required. *Matter of Guardianship of F.E.H.,* 154 Wis.2d 576, 453 N.W.2d 882 (1990). Similarly, the Nebraska court, in following its early opinion in *Tingley,* added: " '[Discretion] means the application of statutes and legal principles to all of the facts of a case.' " *Goebel v. Holt County,* 172 Neb. 81, 108 N.W.2d 406, 410 (1961) (quoting *Greenberg v. Fireman's Fund Ins. Co. of San Francisco,* 150 Neb. 695, 35 N.W.2d 772, 776 (1949)). Justice Heffernan recognized in *McCleary v. State,* 49 Wis.2d 263, 182 N.W.2d 512, 519 (1971):

> In the first place, there must be evidence that discretion was in fact exercised. Discretion is not synonymous with decision-making. Rather, the term contemplates a process of reasoning. This process must depend on facts that are of record or that are reasonably derived by inference from the record and a conclusion based on a logical rationale founded upon proper legal standards.

*See also D.H. v. State,* 76 Wis.2d 286, 251 N.W.2d 196, 208 (1977). With such dependency on the facts for exercised discretion, *Rickaby v. Wisconsin Dept. of Health & Social Services,* 98 Wis.2d 456, 297 N.W.2d 36 (1980), any real decision made by the trial court in this case only went so far as to leave the facts, which actually existed, undisclosed and unknown. This reaches my continued concern about adjudicating from ignorance, *see Engberg v. Meyer,* 820 P.2d 70, 142 (Wyo.1991), Urbigkit, C.J., dissenting in part and concurring in part; *Story v. State,* 755 P.2d 228, 232 (Wyo.1988), *cert. denied* 498 U.S. 836, 111 S.Ct. 106, 112 L.Ed.2d 76 (1990), Urbigkit, J., specially concurring; *Cutbirth v. State,* 751 P.2d 1257, 1267 (Wyo.1988), Urbigkit, J., dissenting; and *Frias v. State,* 722 P.2d 135 (Wyo. 1986), and approaches the result recognized by Chief Circuit Judge Monroe McKay, "[which] converts a rule into a license." *United States v. Davis,* 900 F.2d 1524, 1530 (10th Cir.), *cert. denied* 498 U.S. 856, 111 S.Ct. 155, 112 L.Ed.2d 121 (1990),

McKay, Circuit Judge, concurring in part and dissenting in part.

Another problem with any bland absolution of denied voir dire involving the effect of a materially and societally divisive subject such as the so-called "insurance crisis" is that the result is actually determined in application of the imbedded attitude of the trial judge, in application of his individual scope of academic exposure, and his individual attitude about the communicative effect of the institutionally created mass media subliminal advertising. Without voir dire, the trial judge only personifies and individualizes to himself how he thinks other people are informed and effectively become reactive. Furthermore, in result, any knowledgeable exercise of peremptory challenges by litigant's counsel on all sides is unnecessarily constrained when the true "bent of mind" of the jurors cannot be factually assessed. *King v. Westlake*, 264 Ark. 555, 572 S.W.2d 841 (1978); *Babcock v. Northwest Memorial Hosp.*, 767 S.W.2d 705 (Tex.1989). *See also Borkoski v. Yost*, 182 Mont. 28, 594 P.2d 688 (1979).

A current case which provides thoughtful discussion in recognition of modern advertising techniques supports my persuasion:

> [I]nsurance companies should not be able to hide behind the rule prohibiting comments about insurance companies, while at the same time actively and substantially engaging in advertising with the motive of influencing potential jurors in their favor.

*Kozlowski v. Rush*, 121 Idaho 825, 828 P.2d 854, 860 (1992).

We should now recognize that realism to follow the logic and cogency of Justice Bistline's writing in that case by analysis that:

> The insurance companies have injected the issue of the effect of lawsuits on insurance into the public consciousness. Their purpose served by opening the door to the "insurance crisis" debate, they cannot now expect to slam it shut in the face of plaintiffs who hope to discover the effect of the advertisements on the potential jurors in their case. If the

tables were turned in this case, and the plaintiff's bar had launched a media campaign to increase jury awards in Bannock County by showing in graphic detail various personal injuries and the long term effect of same on the victims, we are convinced that the defendants in this case would demand the opportunity to determine whether any of the potential jurors had been biased against defendants in general by the exposure.

*Id.* at 862.

This court, like Idaho in *Kozlowski*, should adopt a rule "which balances the inherent possibility of prejudice from evidence of insurance with the recognition that such evidence is relevant to show bias." *Id.*

My disagreement is generally not with the text of the majority. The problem presented is that without facts, the trial judge cannot really exercise discretion if discretion is to be defined as a knowledgeable decision based on facts and information. *Martin*, 720 P.2d 894. Unless the trial judge has that knowledge, exercised discretion does not exist if he is ignorant of what exposure this particular jury panel has actually received and what persuasion, if any, the national or local institutional advertising campaign has actually achieved. Without voir dire, decision making about jury attitude is essentially either totally conjectural or a judicial reflection of an existent predisposition. The issue is not involvement of insurance companies, it is prejudice and preordination of the jurors, favorable or unfavorable, to the American tort damage and recovery system. The guiding light is the constitutional requirement to provide the fair and impartial jury guaranteed in Wyo. Const. art. 1, § 10.

**C. PRIVILEGE OF THE LITIGANT'S PRIVATE PHYSICIAN TO NOT BECOME AN EXPERT WITNESS FOR OPPOSING LITIGANT**

A third concern results from the broad scope of this appeal and the trial court's control of discovery. It should not be conceded that a waiver of the statutory privilege of a physician/patient relationship ex-

tends beyond factual information regarding condition and treatment in suits for injury recovery. I do not find that filing a suit for bodily injury authenticates making the treating doctor an expert witness for the opposing litigant. Again, I do not agree with this discretional resolution to justify bypassing the statutory right created for a physician/patient privilege against enforced discovery or justifying voluntary testimony without permission from his patient. Wyo.Stat. § 1–12–101(a) provides:

(a) The following persons shall not testify in certain respects:

(i) An attorney or a physician concerning a communication made to him by his client or patient in that relation, or his advice to his client or patient. The attorney or physician may testify by express consent of the client or patient, and if the client or patient voluntarily testifies the attorney or physician may be compelled to testify on the same subject.

The rule that we write here, although directed to the physician/patient relationship, will equally apply to the attorney/client. I would more decisively control discovery of a litigant's lawyer or doctor. We should enforce the statutory preclusion where privilege may be involved by holding that a waiver by institution of a lawsuit is limited to factual testimony. The waiver should be expanded to permit making a professional into a witness during either pretrial discovery or at trial which would require any statement of an opinion possibly contrary in text to the interest of the client or patient. *See* W.R.E. 501; *Piller By Piller v. Kovarsky,* 194 N.J.Super. 392, 476 A.2d 1279 (1984); *cf. Petrillo v. Syntex Laboratories, Inc.,* 148 Ill.App.3d 581, 102 Ill.Dec. 172, 499 N.E.2d 952 (1986), *cert. denied* 483 U.S. 1007, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987); Philip H. Corboy, *Ex Parte Contacts Between Plaintiff's Physician and Defense Attorneys: Protecting the Patient–Litigant's Right to a Fair Trial,* 21 Loy.U.Chi.L.J. 1001 (1990); and Elizabeth Eggleston Drigotas, *Restricting Ex Parte Interviews With Nonparty Treating Physicians: Crist v. Moffatt [326 N.C. 326, 389 S.E.2d 41 (1990)],* 69

N.C.L.Rev. 1381 (1991). Obviously, if plaintiff (or defendant) designates his own physician to give an expert opinion, then discovery is justified as to what the opinion might be. Lacking that designation, I totally fail to find justification for this statutorily precluded fishing expedition in discovery and add this only as another reason for justification adopted by the court in this regard in present decision.

I specifically agree with the trial court, and the majority of this court in result, regarding the denial of discovery directed to asking the treating physician for an expert opinion. I do not agree that the denial of realistic and appropriately directed voir dire was discretionally justified. This would leave the undisclosed insurance company's advertising campaign totally uncontrolled in its intended affect for jury education. Consequently, the jury panel membership would be unplumbed regarding the right of an injured person to recover when he has been negligently harmed. In aspects of this decision not otherwise discussed, I would concur in the result and the logical resolution made in this majority's opinion, except for a final subject which I find requires additional thought.

### D.  PEREMPTORY CHALLENGES WITH MULTIPLE LITIGANTS

Some additional consideration is due the special concurrence of Justice Cardine regarding peremptory challenges. In general, I agree with his criticism, analysis and conclusion. I fear, however, for prospective analysis in development of the Wyoming law, that we may be running very hard to catch the horse to only find that the saddle horse is no longer straying from our immediate control.

As noted in the majority opinion, the Wyoming law on peremptory challenges has been effectively re-defined by court rule effective March 24, 1992. Wyo.Stat. § 1–11–202 (1988) has been superseded in result by adoption of the identical language obtained from federal law provided in 28 U.S.C.S. § 1870 (Law.Co-op.1989), applicable to civil cases:

Peremptory challenges.—Each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the making of challenges or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly.

W.R.C.P. 47(c).

The definable charge from Wyo.Stat. § 1–11–202 is to augment trial court discretion and direction to the concept advanced by Justice Cardine in his special concurrence—essential fairness and numerical equality unless real adversity is demonstrated by the party or parties requesting the unequal number.

This application has worked fairly consistently for the federal court system for an extended time. 9 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure*, § 2483 at 474 (1971 & Supp. 1992). The criteria is exercised discretion, *John Long Trucking, Inc. v. Greear*, 421 F.2d 125 (10th Cir.1970); the test is sound and reasonable application by the court. *Standard Industries, Inc. v. Mobil Oil Corp.*, 475 F.2d 220 (10th Cir.), *cert. denied* 414 U.S. 829, 94 S.Ct. 56, 38 L.Ed.2d 63 (1973); *Albina Engine & Mach. Works, Inc. v. Abel*, 305 F.2d 77 (10th Cir.1962); *Globe Indem. Co. v. Stringer*, 190 F.2d 1017 (5th Cir.1951). Finally, the trial court's discretion under procedure, statute or rule is considerable, but it is not unlimited. *Goldstein v. Kelleher*, 728 F.2d 32 (1st Cir.), *cert. denied* 469 U.S. 852, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). It is further noted that the augmented responsiveness of the pretrial conference rule now provided in W.R.C.P. 16 explicitly invites early decision on multi-party peremptory challenge alignment. *See Hunsaker v. Bozeman Deaconess Foundation*, 179 Mont. 305, 588 P.2d 493 (1978).

The District Courts should seriously consider the use of the pretrial conference as the best procedure to be used in resolving questions such as the number of peremptory challenges to be allowed each side. If for some rare reason the District Court holds no pretrial confer-

ence, the question of peremptory challenges should be raised [by a litigant] by appropriate written motion filed before the commencement of jury selection, and it should set forth all facts and references tending to support [that party's] claim of hostility. In any case, the opposing party or parties should be given adequate time to respond to the claims of hostility.

*Id.* 588 P.2d at 501.

E.  ADEQUATE INSTRUCTION OF THE JURY ABOUT THEIR VERDICT—DUE PROCESS AND WYO.STAT. § 1–1–109

Following enactment by the Wyoming State Legislature in 1973 of comparative negligence, 1973 Wyo.Sess.Laws ch. 28, two amendments followed to insert fairness into trial procedure. Each was directed to require jury instructions considering the effect of their verdict and are now restated in the language of Wyo.Stat. § 1–1–109(b)(i)(B). This is the "inform the jury of their verdict" requirement. That language was intentionally not limited by the Wyoming legislature to the fifty-fifty no recovery result remaining from the state law of origin, Wisconsin.

I consistently believe and emphatically contend that knowledge improves jury results and ignorance increases unjustified accidents or mischance in result. *See Coryell v. Town of Pinedale*, 745 P.2d 883 (Wyo.1987), Urbigkit, J., specially concurring, and *Harmon v. Town of Afton*, 745 P.2d 889 (Wyo.1987), Urbigkit, J., dissenting. Furthermore, I believe in the plain meaning of the statutory language that the jury should be adequately informed. *Allied–Signal, Inc. v. Wyoming State Bd. of Equalization*, 813 P.2d 214 (Wyo.1991).

The difficulty exposed in this appeal is that the identical issue now exists in another appeal present in this court. *Haderlie v. Sondgeroth*, Wyoming Supreme Court, Docket No. 91–114. This court will have to first address in *Haderlie* credit for pre-verdict settlements. If credit is to be given by some rule of law, the significance of the jury instruction is minimized, but not neces-

sarily eliminated. If credit is not given, then adequate jury instructions become a concern of paramount importance for the jury intent to be reflected properly in its verdict. This is true to assure adequate compensation or, conversely, to avoid double payment.

I do not concur with the simple denial by the majority opinion of a requirement for adequate instructions to inform the jury of the consequences of the percentage of fault as it results in actual dollars included in the verdict to be payable to a successful plaintiff.

If the credit if not given, my perspective of an adequate instruction would advise the jury that if settlement has been made, credit, if any, will be given in the final verdict as a matter of law so that the jury should determine, without considering settlements, an adequate total verdict and a fair resolution of percentage of fault.

If *Haderlie* should determine that credit will not be given in the final judgment for pre-verdict settlements, then the amount of the settlement should be included in the jury instructions for the jury's knowledge to determine "full recovery." This is necessary in order to avoid either underpayment or payment of more than the total damages. Without this instructional assistance, we leave the jury with a requirement to speculate about the absence of some actors from the active litigative process. Whatever those assumptions might be, e.g., settlement, bankruptcy or insolvency, since driven by guess and chance, the deliberative process is not provided required knowledge for the result to reflect consequent fairness and validity in the entered verdict. The difference between a developed assumption by the jury of a last chance or another chance, in itself, can produce a monumental difference in the award given.

Consequently, as we await the decision in *Haderlie*, I will continue strong disagreement with any prejudgment here as to adequate instructions in order for the jury to be "inform[ed] of the consequence of its determination of the percentage of fault." Only with adequate instructions for an informed jury will the litigative system be able to proceed to reasoned justice instead of accident and misassumption from ignorance. *Theobold v. Angelos,* 40 N.J. 295, 191 A.2d 465 (1963); *Greenemeier by Redington v. Spencer,* 719 P.2d 710 (Colo. 1986).

Consequently, I concur in the decision with the differences from the text of the decision as enumerated.