PETSCH & MCDONALD, APPELLEE, V. WALKER D. HINES, DIRECTOR GENERAL, APPELLEE: UNION STOCK YARDS COMPANY OF OMAHA, APPELLANT.

FILED MARCH 27, 1923. No. 22254.

1. **Carriers:** NEGLIGENCE: EVIDENCE: SUBMISSION TO JURY. In a suit against common carriers for damage resulting from their alleged negligence whereby they delayed the unloading and delivery of a shipment of live stock, the evidence summarized in the opinion is *held* sufficient to raise a question of fact to be submitted to the jury, and to support the verdict.

2. ———: DAMAGES. Where there is competent evidence in support of a claim for damages resulting from delay in unloading and delivering a shipment of live stock, and from a consideration of which different minds might arrive at different amounts, the verdict of a jury will not be held excessive when it is within an amount that seems fair and reasonable under the evidence.

3. **New Trial:** MOTION: DETERMINATION AT SUBSEQUENT TERM. Where a trial court takes a motion for a new trial, which is filed during the term at which a verdict is returned, under advisement and fails to pass upon the motion until after the term has been adjourned and a subsequent term convened, it does not lose jurisdiction of the subject-matter, but may then pass upon the motion and enter judgment.

4. **Jury:** PEREMPTORY CHALLENGES. The right to peremptory challenges in civil actions did not exist at common law, and any right thereto is dependent on statutes or rules of court.

5. ———: ———: RULE OF COURT. In this state the only authority for peremptory challenges in civil actions is by rule of court.

6. ———: ———: SEVERAL PARTIES. In civil actions where there are several plaintiffs or several defendants, generally all on one side constitute but one party and are entitled to three peremptory challenges, and no more.

7. ———: ———: PARTIES UNITED IN INTERESTS. In civil actions a party and an intervener whose interests are not adverse constitute a single party within the rule governing peremptory challenges.

8. ———: ———: PARTIES NOT UNITED IN INTERESTS. In civil actions

where several plaintiffs, interveners, or defendants set up separate and distinct causes of action or defenses, and have conflicting rights among themselves which the verdict of the jury will affect, in the furtherance of justice the court will allow each of such parties three peremptory challenges.

9. ———: ———: REFUSAL TO ALLOW. *Held,* under the facts disclosed, that the refusal of the court to grant additional challenges does not constitute prejudicial error.

APPEAL from the district court for Douglas county: CHARLES LESLIE, JUDGE. *Affirmed.*

*Brown, Baxter & Van Dusen,* for appellant.

*Harry W. Shackelford, contra.*

*C. A. Magaw, Douglas F. Smith* and *Thomas W. Bockes,* for Walker D. Hines, appellee.

Heard before MORRISSEY, C. J., ROSE, DAY and GOOD, JJ., TROUP, District Judge.

MORRISSEY, C. J.

Plaintiffs brought this action in the district court for Douglas county against Walker D. Hines, director general of railroads, and the Union Stock Yards Company. Plaintiffs alleged that on August 23, 1919, they delivered, at Haig, Nebraska, to the director general for transportation over the lines of the Union Pacific Railroad Company to Omaha, Nebraska, six car-loads of cattle; the cattle to be delivered to its commission firm through the agency of defendant Union Stock Yards Company. The petition further alleged that the defendants negligently delayed the delivery of the cattle and negligently detained them in the cars without furnishing them with feed or water or an opportunity to rest; that the negligence charged caused a shrinkage in the weight of the cattle to the plaintiffs' damage to the amount of $327.06, and further that, the cattle being delivered late in the day at an hour when the general market for the sale of such cattle had closed, plaintiffs' commission merchants were unable to sell them upon the day of their arrival and were

obliged to hold the cattle until the following day, when they were sold upon a falling market, all to the damage of plaintiffs in the sum of $759.64.

The director general filed a separate answer in which he denied any negligence upon his part in the delivery of the cattle.

The Union Stock Yards Company filed its separate answer alleging that on the day plaintiffs' cattle arrived at Omaha there existed unusual and extraordinary conditions at its stock yards; that upon that day live stock were received in such unprecedented numbers that it was impossible to handle them in the usual and ordinary manner. And it was further alleged that an extraordinary and unusual storm occurred at Omaha on the morning when the cattle arrived, and that this storm added to the difficulties arising from the congestion caused by the great number of cattle received and prevented the expeditious delivery of the cattle. The answer further alleged that plaintiffs' cattle were found to be afflicted with an infectious disease, and were, therfore, ordered into quarantine by a representative of the United States government; that they had to be run through a dipping vat before being released from the quarantine, and that this caused a delay in delivery, for which defendant was in no wise responsible and which caused a depreciation in the market value of the cattle.

Trial was had to a jury, which returned a verdict in favor of plaintiffs and against both defendants for $650. Thereafter, upon motion of the defendant the director general, an indemnity judgment in his favor and against the stock yards company was entered for the amount of the judgment. The Union Stock Yards Company only has appealed.

The principal error assigned goes to the sufficiency of the evidence to support the judgment. It is said in appellant's brief: "Plaintiffs having proved only a *prima facie* case of delay, and defendant having proved

without contradiction an unprecedented congestion, and plaintiffs having failed to prove in reply negligence in coping with the extraordinary circumstances, the record does not support a judgment in favor of plaintiffs and against this defendant."

In support of the quoted statement many citations are given. We have not examined them, but will assume that, if the facts were as appellant assumes them to be, its proposition of law might be applicable. Our examination of the record, however, leads us to a somewhat different conclusion as to the facts. The proof shows that the cattle were loaded at Haig, Nebraska, on the evening of August 23, on a train scheduled to reach Omaha August 25 at 6 a. m.; that the train arrived ahead of its scheduled time and was switched onto appellant's track No. 4, and the way-bills delivered to appellant at 5:48, twelve minutes before the time scheduled for the arrival of the train in Omaha. Upon this uncontradicted showing the trial court instructed the jury that neither negligence nor delay could be imputed to the director general in the transportation of the cattle from Haig to Omaha, but the director general being a common carrier it was his duty to provide reasonable facilities for the delivery of the cattle at destination, and not having provided such facilities, but having employed the Union Stock Yards Company to furnish them and to unload and deliver the cattle to the consignee, the Union Stock Yards Company became in legal effect the agent and servant of the director general. And if the Union Stock Yards Company negligently failed to unload and deliver the cattle within a reasonable time, both the director general and the Union Stock Yards Company became liable to plaintiffs for any damage sustained. The court further instructed the jury that, if they found "the delay in placing the cars at the chutes and unloading was unavoidable or was due to an unusual or unprecedented number of cars being received that morning, or to un-

usual or extraordinary weather conditions, without any negligence on the part of the defendant Union Stock Yards Company, then, in such case, the plaintiffs would not be entitled to recover."

A reading of this instruction shows that the issues of fact presented by the pleadings were fairly presented to the jury. Is the evidence sufficient to support the finding? The evidence shows that in the transaction of appellant's business a day is reckoned in 24-hour periods beginning at midnight. As is customary, trains loaded with live stock began to arrive early on the morning of August 25. The first train of live stock, consisting of 57 cars, was delivered to appellant at 12:55 a. m. Between that hour and 6 a. m. appellant received 586 cars and unloaded 150 cars, an average of only 30 cars an hour, whereas by its own evidence it is shown to have an unloading capacity of 100 cars an hour. It will be seen that defendant, throughout the early hours of the day, did not operate its equipment to its ordinary capacity, and thus permitted a large number of car-load shipments to accumulate upon its tracks. According to what appears to be the most reliable evidence, plaintiffs' cattle were not unloaded until about 1:20 p. m., and were not delivered to the consignee until 2:35 p. m. After being unloaded the cattle were inspected by a government agent, and, in compliance with his directions, they were put through a dipping vat. The time intervening between the unloading and the actual delivery may well be accounted for by this requirement of the government and may not fairly be chargeable against appellant. As already mentioned, the cattle were delivered to appellant at 5:48 a. m. but were not unloaded for six or seven hours thereafter. Had appellant throughout the early hours of the day unloaded the cars at the rate of 100 cars an hour, as its own testimony shows it was able to do, at the time it received plaintiffs' cattle it would have had only 86 cars entitled to a priority over plaintiffs' shipment.

This would constitute less than one hour's work and ought to have been finished by 7 o'clock a. m. It is not possible to calculate with exactness the hour at which plaintiffs' shipment might have been unloaded, but it would appear that an additional hour or two, or until 8 or 9 o'clock, would be ample time within which to unload plaintiffs' shipment. We take no note of appellant's defense of unfavorable weather conditions, because there is a total failure of proof to support this defense.

The foregoing calculation is made, also, without taking into account what appellant claims was an unusual and unprecedented rush of business, and congestion on its tracks; but an expeditious use of appellant's facilities throughout the early hours of the morning might have avoided much of the congestion. Nor are we ready to say from a consideration of all the evidence that there was such a press of business as is claimed by appellant. The proof shows that an average "run" during the period of the year when this shipment was made is from 550 to 800 cars a day, and that trains usually arrive between midnight and 7 o'clock in the morning; that cars are ordinarily unloaded within two hours after their arrival, the work being completed about 8:30 in the morning. It is claimed by appellant that on the day plaintiffs' shipment arrived it received 1,283 cars, which was the largest in all its history. There is some proof in the record to support this claim, but it is not without question even on appellant's own showing. On this point, where we might expect to find positive proof, there is marked conflict in the evidence. The evidence might support a finding that 1,283 cars were received or it might support a finding that the number was 974 cars, while from other evidence it might be found that the total number was only 844. With this conflict in the record, the number of cars received that day became a disputed question of fact. If the maximum number claimed, 1,283, were received, it was a

most unusual run. If, on the other hand, appellant received only the minimum shown, 844 cars, it was not such an unusual run as to constitute an extraordinary congestion.

In connection with appellant's claim of congestion, it is asserted that, after the train containing plaintiffs' shipment was placed on track No. 4, another train was placed upon that track, thus covering up plaintiffs' shipment and making it impossible to unload it until the second train had been unloaded. We are not prepared to say that the presence of the second train upon track 4 would constitute an excuse for defendant's failure to unload plaintiffs' cattle within a reasonable time after their receipt. In any event, it is not a sufficient defense under the circumstances of this case, for the second train was not placed upon track 4 for one hour and 40 minutes after the cars containing plaintiffs' cattle had been placed thereon, and it was removed at 9:05. Giving the evidence the construction most favorable to appellant, the track then remained open until 11:20. A jury might well have found that appellant had ample time to unload plaintiffs' cattle before the second train was placed on track No. 4; also that, had it moved with reasonable dispatch after the second train was removed from track 4, plaintiffs' cattle might have been unloaded and delivered during the early hours of the day. The evidence is sufficient to support the verdict.

It is claimed that the damages are excessive. Experience in the actual shipment and handling of large numbers of cattle enables those engaged in the business to approximate the shrinkage under given conditions. The evidence of shrinkage is perhaps as positive and satisfactory as the nature of the subject will permit. What has been said of shrinkage may also be said of live-stock markets. The shrinkage in the cattle and the drop in the market, with the reason for both, were fully gone into and explained by competent witnesses

before the jury, and, when considered in the light of the evidence, the verdict does not appear excessive.

It is said that the court lacked jurisdiction to enter judgment on the verdict. The verdict on which this judgment is based was returned December 11, 1920, at the October term. Two days later appellant filed a motion for judgment notwithstanding the verdict, as well as a motion for a new trial; and the director general filed a motion for a new trial, and a motion for an alternative judgment against his codefendant, the Union Stock Yards Company. January 15, 1921, during the October, 1920, term, the court entered an order taking under advisement the motions. Sixteen days later the court entered an order on the motion of the director general for an indemnity judgment against the Union Stock Yards Company.

Apparently the court as well as the parties were under the impression that an order overruling the motions for new trial had been made and entered, but no such order was in fact made or entered. This omission was not discovered until after the adjournment of the October, 1920, term. And upon such discovery the court, at the February, 1921, term, overruled the respective motions for a new trial and entered a general judgment upon the verdict, and again entered an alternative judgment in favor of the director general against the Union Stock Yards Company.

The court having taken the motion for new trial under advisement at the October, 1920, term, it did not lose jurisdiction merely because of the adjournment of that term of court and the convening of a subsequent term. While this was not the precise question presented in *Toogood v. Russell*, 3 Neb. (Unof.) 189, yet the principle was recognized.

As a final assignment appellant complains because the court refused to permit appellant and its codefendant each the full number of three peremptory challenges to the jury. The right to peremptory challenges

in civil actions did not exist at common law, and the right thereto is dependent on statutes or rules of court.

At the regular session of the first general assembly of the territory of Nebraska, held in 1855, certain parts of the Code of Iowa were adopted. Section 354, found on page 91, Nebraska Statutes, 1855, 1856, 1857, provides: "The plaintiff first, and afterward the defendant, shall complete his challenges for cause. They may then in turn in the same order have the right to challenge one juror each until each shall have peremptorily challenged five jurors, and no more."

The provision above quoted was modified at the January, 1857, session of the territorial legislature by the passage of section 13, ch. 14, found on page 69, Nebraska Statutes, 1855, 1856, 1857.

At the fourth session of the territorial legislature, 1857-1858, a comprehensive "Code of Civil Procedure" (Neb. St. 1857, 1858, 1859, page 109), copied almost verbatim from the Code of Ohio, was adopted, and with slight changes has remained our Code of Civil Procedure to the present day. In this enactment all mention of peremptory challenges is omitted. However, the right of peremptory challenge appears to have been still recognized by the courts.

Mr. Justice Maxwell in his valuable work on Pleading and Practice (6th ed.) p. 187, in a foot-note, says: "In the absence of any statutory authority for such challenges there is no doubt of the power of a court to provide by rule for a reasonable number on each side. The only authority in Nebraska for peremptory challenges is by unwritten rules of court." Perhaps for the purpose of putting the unwritten rules in concrete form, for the question does not appear to have been involved in the case, the court in *Kremling v. Lallman,* 16 Neb 280, announced that, upon the trial of a civil case, "neither party is entitled to more than three peremptory challenges." Just when or how the court arrived at

the number mentioned is not discoverable from the books.

In dealing with the subject in a case arising under a liquor statute which gave a cause of action to one suffering injury because of defendants' traffic in intoxicants, this court said: "When such action is brought against two or more defendants they are entitled to no more peremptory challenges of jurors than where the action is against a single defendant." *McClay v. Worrall*, 18 Neb. 44.

As to the rights of coplaintiffs or codefendants to peremptory challenges in 24 Cyc. 356, it is said: "In civil actions where there are several plaintiffs or several defendants, the general rule is that all on one side constitute but one party and are entitled only to the number of peremptory challenges allowed a single plaintiff or defendant; and statutes giving to 'each party' a certain number of peremptory challenges are uniformly so construed. A party and an intervener whose interests are not adverse constitute a single party within the application of this rule. The rule, however, is to be applied according to the reasons upon which it is based and limited (to) cases in which the positions of the several parties upon the same side are similar, so while the fact that several defendants who set up a common defense plead separately does not entitle them to any additional peremptory challenges, the rule is otherwise where they set up separate and distinct defenses presenting different issues, or where the parties on one side, although having a common cause against the other, have conflicting rights among themselves which the verdict of the jury will affect."

Coming directly to the question presented on this appeal, we find that at the opening of the trial each defendant asked that it be allowed three separate peremptory challenges. These requests were denied. Thereupon each defendant asked that the record be made to show that it exercised every peremptory chal-

lenge allowed.   This request was denied, and the record fails to disclose whether defendants, or either of them, exercised any of the challenges allowed.

In view of the separate and distinct defenses set up by the defendants and the contingent right of one to recover over from the other, the court might well have allowed each defendant to exercise its separate right to three peremptories.   However, under the facts disclosed by this record, the ruling cannot be held to be prejudicial, and the judgment is

AFFIRMED.