TAMARA GESTRING, PERSONAL REPRESENTATIVE OF THE ESTATE OF LARRY E. GESTRING, DECEASED, APPELLANT, V. THE MARY LANNING MEMORIAL HOSPITAL ASSOCIATION, A CORPORATION, ET AL., APPELLEES.

613 N.W. 2d 440

Filed July 7, 2000.   No. S-98-1234.

Denzel R. Busick, of Luebs, Leininger, Smith, Busick, Johnson, Baack, Placzek & Steele, for appellant.

Robert W. Wagoner for appellee Mary Lanning Memorial Hospital Association.

William M. Lamson, Jr., and William R. Settles, of Lamson, Dugan & Murray, for appellees Hastings Internal Medicine Associates, P.C., Surgery: Adult, Pediatric, Vascular, P.C., Richard D. French, M.D., and Gary W. Barth, M.D.

HENDRY, C.J., WRIGHT, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

Tamara Gestring, as personal representative of the estate of her late husband, Larry E. Gestring (Gestring), brought this action against the Mary Lanning Memorial Hospital Association (Mary Lanning); Hastings Internal Medicine Associates, P.C.;

Surgery: Adult, Pediatric, Vascular, P.C.; Richard D. French, M.D.; and Gary W. Barth, M.D. (collectively defendants), alleging wrongful death from medical malpractice and negligence under state law and a violation of the federal Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (1994). This appeal presents the question whether it is appropriate for a trial court to grant additional peremptory challenges to codefendants in a civil case when the codefendants may be defending different theories, but the interests of those defendants are not adverse. For the reasons stated herein, we conclude that the personal representative's motion for a new trial should have been sustained; thus, we reverse the judgment of the district court and remand this matter for a new trial.

## FACTUAL BACKGROUND

This case arises from a set of circumstances which began on September 10, 1994, and culminated with the death of Gestring on September 12. On September 10, Gestring became ill and was experiencing sharp pains in his abdomen. Gestring went to the emergency room at Webster County Community Hospital in Red Cloud, Nebraska, where he was examined by Estella Chan, M.D. Gestring explained that he had been ill for 3 days prior to September 10. Chan saw Gestring in the emergency room and admitted him into the hospital at approximately 11:15 a.m.

Chan's examination revealed that Gestring was weak and dehydrated, with a slightly distended and significantly tender abdomen. Gestring had been producing an abnormally small amount of urine and was catheterized because of his inability to void. Gestring was placed on intravenous hydration, and a nasogastric tube was inserted due to his continuing complaints of nausea. Demerol was administered for pain, and Gestring was given intravenous antibiotics. Chan then explained that Gestring's condition was severe and recommended that Gestring be transferred to Hastings, where he could be examined by Barth. The Gestrings consented to the transfer, and Gestring was discharged from the Webster County hospital at approximately 5:15 p.m. on September 10, 1994.

Upon his arrival at Mary Lanning in Hastings, Gestring was examined by Mark Brosnihan, M.D., and Barth. Barth initially

diagnosed Gestring's condition as an "acute abdomen," or abdominal pain, and quite possibly a perforated ulcer or ruptured viscus. Uncertain of Gestring's actual condition, Barth decided to conduct an exploratory laparotomy.

During the exploratory laparotomy, Barth examined many of Gestring's internal organs in an effort to determine the cause of Gestring's condition. Barth became concerned when he palpated a phlegmonous (a very inflamed, reddened, irritated) area of the colon near the upper left quadrant of the large bowel, in the area of the splenic flexure. Barth concluded that the mass was not malignant and that the mass was an acute diverticulitic condition of the splenic flexure. Barth's notes from the operation added that the mass might also be an inflammatory bowel disease.

Barth testified that he did not remove the mass because he could not get "a good plane," which would have allowed him to dissect the mass with scissors or by hand. After discussing all options with his assistants, Barth concluded that Gestring suffered from a moderately severe case of diverticulitis. Because Gestring was very ill, and quite possibly toxic, Barth decided that resection of the colon was not essential and could lead to complications. Gestring's abdominal cavity was irrigated with saline solution, after which Barth closed the incision and treated Gestring nonoperatively. Gestring was taken to the recovery room and then placed in Mary Lanning's intensive care unit (ICU).

Barth testified that he ordered Gestring to be placed in ICU because Gestring's medical chart indicated that he may have been undergoing some renal impairment when he arrived at Mary Lanning. While in ICU, Gestring's urine output did not increase. Barth then consulted French, an internist, who recommended that Gestring be given doses of Lasix and Mannitol intravenously in an attempt to improve Gestring's urine output and overall condition. Gestring's urine output did not significantly improve during the evening hours of September 11, 1994.

As the evening progressed, Gestring's condition continued to decline. Concerned that Gestring might possibly need dialysis treatment, Barth contacted Scott Liggett, M.D., a practicing nephrologist in Lincoln, Nebraska. After a telephonic consulta-

tion with Liggett, Barth decided to transfer Gestring to a hospital in Lincoln then known as Bryan Memorial Hospital, where Gestring could receive hemodialysis should such treatment become necessary. Barth and French then consulted Gestring's family and discharged Gestring from Mary Lanning via ground ambulance at approximately 11 p.m.

Before Gestring could be discharged, Mary Lanning, as the discharging hospital, was required by federal law to complete certain paperwork regarding Gestring's status upon discharge. On that paperwork, Barth certified that Gestring suffered from an emergency medical condition which had been stabilized prior to transfer. Upon his arrival at Bryan Memorial Hospital, Gestring experienced cardiac and respiratory arrest at the door to the emergency room. Attempts to resuscitate Gestring failed, and he was pronounced dead at 1:24 a.m. on September 12, 1994.

An "abdomen only" autopsy was conducted on September 12, 1994. Gordon Hrnicek, M.D., testified at trial that the autopsy results led him to the conclusion that Gestring died from a pulmonary embolism. On cross-examination, however, Hrnicek admitted that the pulmonary embolism, assuming Gestring suffered from such a condition, was secondary to the medical condition for which he was initially hospitalized. There was conflicting expert testimony at trial regarding the ultimate cause of Gestring's death; most experts relying upon the limited scope of the autopsy to explain why their conclusions differed from those of other experts.

The personal representative filed a petition in the district court for Adams County, seeking damages for the wrongful death of and personal injury to Gestring. The petition alleged, inter alia, that the defendants fell below the standard of care for treatment of Gestring in such a manner as to cause him needless physical suffering and mental distress as well as physical deterioration which led directly to his death. The petition also asserted that Mary Lanning was strictly liable insofar as it failed to require strict compliance with the patient transfer provisions of 42 U.S.C. § 1395dd, causing Gestring unnecessary physical suffering and mental distress prior to his death and substantially contributing to his death. In addition to the cause of action for wrongful death, the personal representative sought recovery in a

second cause of action for the physical pain and discomfort suffered by Gestring immediately prior to his death. A third and separate cause of action was pled for funeral and burial expenses. The defendants answered by denying the personal representative's allegations.

Prior to trial, the district court decided that Barth, French, and their respective employers were defending similar interests and granted the attorney representing all such defendants a total of three peremptory challenges of the jury panel. The court reasoned that there was a separate and distinct theory of recovery against Mary Lanning and granted counsel for Mary Lanning three separate peremptory challenges. The personal representative objected to the district court's allocation of peremptory challenges, arguing that the defendants represented similar interests and that they should receive only three challenges amongst them or, in the alternative, that the personal representative should receive six challenges so as to receive an amount equal to that of the defendants. The objection was overruled, and the case proceeded to trial.

Mary Lanning made a motion for a directed verdict at the close of the personal representative's case in chief, which was partially sustained by the district court; the court sustained Mary Lanning's motion as to the cause of action for wrongful death and dismissed Mary Lanning as a defendant as to that cause of action. All other issues were submitted to the jury, which returned a verdict in favor of all of the defendants. On July 20, 1998, the district court entered judgment upon the jury verdict. The personal representative's timely motion for a new trial was overruled on November 4, and this appeal ensued. We moved the matter to our docket pursuant to our authority to regulate the caseloads of the appellate courts of this state.

## ASSIGNMENTS OF ERROR

The personal representative asserts that the district court erred in (1) granting six peremptory challenges to the defendants while granting only three to the plaintiff, (2) partially sustaining Mary Lanning's motion for a directed verdict and dismissing Mary Lanning as a defendant in the wrongful death action, and (3) failing to adequately instruct the jury on provi-

sions and definitions contained within EMTALA, which the personal representative claims were essential for the jury to obtain a proper understanding of her claims thereunder.

## STANDARD OF REVIEW

A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Snyder v. EMCASCO Ins. Co., ante* p. 621, 611 N.W.2d 409 (2000); *Heald v. Heald, ante* p. 604, 611 N.W.2d 598 (2000). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Heald v. Heald, supra.*

## ANALYSIS

### PEREMPTORY CHALLENGES

The personal representative first asserts that the district court erred in granting the defendants six peremptory challenges while granting her only three and that such error entitles her to a new trial. For the reasons that follow, we conclude that the personal representative was prejudiced by the district court's allocation of peremptory challenges and that she is therefore entitled to a new trial.

The number of peremptory challenges allowable in civil actions where there are more than two parties involved is ordinarily controlled by statutes, court rules, or on rare occasions, a municipal charter. Most statutes of this nature provide that "each side" or "each party" is to be given the same number of peremptory strikes and that where one side contains multiple parties whose interests are adverse, each party may then be granted individual sets of peremptory challenges. See Annot., 32 A.L.R.3d 747 (1970). Nebraska, however, is without a statute that governs the distribution of peremptory challenges, and in this state, the issue is governed by " 'unwritten rules of court.' " See *Petsch & McDonald v. Hines*, 110 Neb. 1, 9, 192 N.W. 963, 966 (1923). The absence of a controlling statute notwithstanding, a rule similar to that found in other jurisdictions which have interpreted such statutes can be gleaned from prior decisions of this court.

Our closest confrontation of the issue occurred in *Petsch & McDonald v. Hines, supra.* In *Petsch & McDonald v. Hines,* 110 Neb. at 8, 192 N.W. at 966, one codefendant argued on appeal that the trial court erred in refusing "to permit appellant and its codefendant each the full number of three peremptory challenges to the jury." This court began its discussion by noting that peremptory challenges in civil actions did not exist at common law and that the right thereto is dependent on statutes or rules of court. The *Petsch & McDonald* court then noted that all mention of peremptory challenges had been omitted when the latest version of the civil code had been enacted by the Legislature. "However, the right of peremptory challenge appears to have been still recognized by the courts," 110 Neb. at 9, 192 N.W. at 966, and " '[i]n the absence of any statutory authority for such challenges there is no doubt of the power of a court to provide by rule for a reasonable number on each side,' " *id.*

We further explained in *Petsch & McDonald v. Hines,* 110 Neb. at 10, 192 N.W. at 966, that when an action is brought against two or more defendants, " 'they are entitled to no more peremptory challenges of jurors than where the action is against a single defendant' " and that when several defendants set up a common defense, they are not entitled to additional peremptory challenges. We, however, qualified our holding in *Petsch & McDonald* by stating that " 'the rule is otherwise where they set up separate and distinct defenses presenting different issues, or where the parties on one side, although having a common cause against the other, have conflicting rights among themselves which the verdict of the jury will affect.' " 110 Neb. at 10, 192 N.W. at 966.

The issue was revisited by this court in *Masonic Bldg. Corporation v. Carlsen,* 128 Neb. 108, 258 N.W. 44 (1934). *Masonic Bldg. Corporation* once again involved defendants who claimed the right to separate sets of peremptory challenges. The trial court therein determined that the answers of the various defendants did not raise adverse claims *as between themselves* and therefore limited the defendants to three challenges to be exercised collectively. This court affirmed upon a finding that the defendants raised similar defenses.

The instant case once again presents the question whether codefendants in a civil case should be granted separate sets of peremptory strikes or, in the alternative, whether a plaintiff should receive additional challenges when the court grants multiple defendants additional peremptory strikes. This issue is properly analyzed by answering two interrelated questions: (1) was it error for the trial court to grant additional peremptory challenges to each defendant, and (2) if it was error, must the personal representative show that she was prejudiced by such error before she is entitled to a new trial?

■ *Petsch & McDonald v. Hines*, 110 Neb. 1, 192 N.W. 963 (1923), and *Masonic Bldg. Corporation v. Carlsen, supra*, stand for the proposition that where there are multiple parties on the same side of a civil lawsuit, each *side* of the lawsuit is entitled to a total of three peremptory challenges unless the multiple parties' interests are adverse to *each other*. If the parties' interests are adverse to each other, the trial court may properly grant each party three peremptory strikes of its own. Because the interests of Mary Lanning are not adverse to the interests of the other defendants, we conclude that the district court erred when it granted Mary Lanning additional peremptory challenges.

■ The Wyoming Supreme Court confronted a similar issue in *Wardell v. McMillan*, 844 P.2d 1052 (Wyo. 1992), and the court's analysis is instructive. Interpreting a statute granting each *side* of a lawsuit three peremptory challenges, *Wardell* establishes a general framework under which such claims are to be analyzed. The *Wardell* court explained that " '[i]n determining whether multiple defendants constitute one side, consideration must be given the nature of the claim against them and whether the defendants' interests are or may be antagonistic,' " 844 P.2d at 1060, and that "[m]ulti-party defendants' interests are antagonistic when a good-faith controversy exists, vis-a-vis each other, over an issue of fact which the jury will decide," *id.* at 1061. The *Wardell* court continued:

> When such a controversy exists, the defendants constitute separate "sides" . . . and are entitled to have additional peremptory challenges. This result is justified by the rationale that certain of the extra challenges will be used to

select a jury for the case against the other defendant, rather than against the plaintiff. . . .

When, on the other hand, no good-faith controversy exists between multi-party defendants and they are yet awarded extra peremptory challenges, the single-party plaintiff is placed in a distinct tactical disadvantage. The multi-party defendants, having no motive to exercise their additional challenges against a co-defendant, are able to pool their challenges against the plaintiff. . . . To allow nonantagonistic, multi-party defendants a two-, three- or four-to-one advantage in the exercise of peremptory challenges affords them undue influence over the composition of the jury and implicates the single-party plaintiff's right to a fair trial.

844 P.2d at 1061. Thus, a trial court should consider all relevant circumstances to determine whether the defendants actually are involved in a good faith controversy on an issue of fact to be decided by the jury, and it is incumbent upon the defendants to assist the trial court in making such a determination. See *id.*

*Wardell* provides an "illustrative, but not exhaustive," list of factors to be considered when making such a determination: (1) whether separate acts of misconduct were alleged against the separate defendants, (2) whether comparative negligence principles applied to the case, (3) the type of relationship among the defendants, (4) whether cross-claims or third-party complaints had been filed and the positions taken therein, (5) information disclosed on pretrial discovery, and (6) representations made by the parties. 844 P.2d at 1061. Other jurisdictions have adopted similar approaches. See, e.g., *Gallegos v. Southwest Com. Health Services*, 117 N.M. 481, 872 P.2d 899 (N.M. App. 1994); *St. Luke Church v. Smith*, 318 Md. 337, 568 A.2d 35 (1990); *Staiger v. Gaarder*, 258 N.W.2d 641 (N.D. 1977); *Massoni v. State Highway Commission*, 214 Kan. 844, 522 P.2d 973 (1974), *overruled in part on other grounds, Lollis v. Superior Sales Co.*, 224 Kan. 251, 580 P.2d 423 (1978). We determine that the trial courts of this state should likewise consider the above-listed circumstances when determining whether additional peremptory challenges should be allowed to multiple parties on the same side of a civil lawsuit.

The district court granted three additional peremptory challenges to Mary Lanning because there were different theories of recovery against Mary Lanning and because Mary Lanning was not acting "in collusion" with the other defendants. Further, the district court relied, at least in part, upon the fact that Mary Lanning had hired its own attorney. Notably absent from the trial court's determinations, however, is a finding that the *interests* of the multiple defendants were adverse.

Mary Lanning did file an answer separate from that filed by the other defendants. As in *Masonic Bldg. Corporation v. Carlsen*, 128 Neb. 108, 258 N.W. 44 (1934), however, neither Mary Lanning's nor the other defendants' answers assert that Gestring's death was the fault of the other. To the contrary, the defendants generally denied the allegations in the personal representative's petition and affirmatively alleged only that they each had met the applicable standard of care. Thus, despite the fact that Mary Lanning may be forced to defend an additional theory of recovery on the EMTALA claim, the granting of three additional peremptory challenges created a situation in which the defendants had "no motive to exercise their additional challenges against a co-defendant, [but were] able to pool their challenges against the plaintiff." *Wardell v. McMillan*, 844 P.2d 1052, 1061 (Wyo. 1992).

We hold that additional peremptory challenges should be granted to multiple parties on the same side of a civil lawsuit only after the trial court has considered all of the circumstances of the case and determined that the interests of those multiple parties are adverse to each other. Allowing the defendants in the instant case a six-to-three advantage in the exercise of peremptory challenges afforded them a substantial edge in determining the composition of the jury and potentially deprived the personal representative of substantial rights and a just result in a matter submitted for disposition. The district court made no determination that Mary Lanning's interests were adverse to those of the other defendants, and the record does not support such a determination. We therefore conclude that the district court should have sustained the personal representative's motion for a new trial, the denial of which constitutes an abuse of discretion.

The defendants argue that even if the district court erred in granting additional peremptory challenges, the personal representative has not shown how she was prejudiced by the district court's decision and that she is therefore not entitled to a new trial. This contention is without merit.

In a similar case involving the grant of additional peremptory challenges to multiple defendants, the Supreme Court of Kentucky explained:

> The requirement of a showing of actual prejudice effectively nullifies the requirements of the rule on allocation of peremptory challenges. To show actual prejudice, the complaining litigant would be required to discover the unknowable and to reconstruct what might have been and never was, a jury properly constituted after running the gauntlet of challenge performed in accordance with the prescribed rule of the game. . . .
>
> . . . As long as [peremptory challenges are] part of the trial process . . . we believe that their proper allocation between litigants is a substantial right which so pervades the process that its erroneous application requires reversal as a matter of law if the issue is properly preserved by the adversely affected litigant.

*Kentucky Farm Bur. Mut. Ins. Co. v. Cook*, 590 S.W.2d 875, 877 (Ky. 1979). We agree with the court's rationale, and we hold that when additional peremptory challenges are granted to a party, absent a showing that her or his interests are adverse to other parties on the same side of a civil lawsuit, prejudice will be presumed, and a judgment must be reversed on appeal for unwarranted allowance of supernumerary challenges. See *Thompson v. Presbyterian Hosp., Inc.*, 652 P.2d 260 (Okla. 1982).

In the case at bar, the personal representative objected to the defendants' obtaining twice as many peremptory challenges as she was granted, so the issue has been properly preserved for appeal. Because an absence of balance in the jury selection process is a cognizable form of prejudice which will be presumed if properly preserved for appeal, we conclude that the district court abused its discretion in denying the personal representative's motion for a new trial, which should have been granted.

■ Although our disposition requires that this case be remanded for a new trial and we need not reach all of the errors assigned, there is another aspect of this case which is likely to recur upon remand. An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings. *Snyder v. Contemporary Obstetrics & Gyn.*, 258 Neb. 643, 605 N.W.2d 782 (2000). We therefore proceed to consider the personal representative's assignment of error regarding the district court's grant of a directed verdict in favor of Mary Lanning with reference to the personal representative's EMTALA claim, since the issue is likely to recur upon remand.

### DIRECTED VERDICT ON EMTALA CLAIM

The personal representative asserts in her second assignment of error that the district court erred in partially sustaining Mary Lanning's motion for a directed verdict. The district court granted Mary Lanning's motion for a directed verdict with regard to the wrongful death cause of action, reasoning that EMTALA precluded an action against Mary Lanning for wrongful death and provided only for causes of action seeking redress for personal injuries suffered by a patient prior to his or her death. For the following reasons, we conclude that the district court erroneously granted the directed verdict in Mary Lanning's favor.

In partially sustaining Mary Lanning's motion for a directed verdict, the district court reasoned:

> The [EMTALA] statutes however provide the following, that any individual who suffers personal harm as a direct result of a participating hospital's violation of requirements of this section may in a civil action against the participating hospital obtain those damages available for permanent injury under the law of the state in which the hospital is located and such equitable relief as is appropriate. That language makes the hospital responsible for permanent injuries caused to Mr. Gestring because of the violations if there are violations of the EMTALA statute. That language specifically does not include any obligation or recovery to any other party through a wrongful death

action or any other type of action against the hospital for an EMTALA violation, therefore the hospital is only responsible for the injuries caused to the decedent which essentially will be when we get through this from the time that transfer is started until the time of the death of the decedent.

They're not responsible for any wrongful death recovery to which other persons might be entitled.as a result of that death.

The district court further reasoned that there was no evidence on which to conclude that the negligence of Mary Lanning contributed to Gestring's death and concluded that Mary Lanning should not remain as a defendant in the wrongful death cause of action.

■■■ EMTALA provides that "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may . . . obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." 42 U.S.C. § 1395dd(d)(2)(A). In Nebraska, when a person dies as a result of the negligent or wrongful act of another and the conduct is such that if death had not occurred, the deceased would have had a cause of action to recover damages, then the person or entity whose conduct brought about the death is liable to the surviving next-of-kin, regardless of the death. See Neb. Rev. Stat. §§ 30-809 and 30-810 (Reissue 1995). Thus, "the law of the State in which [Mary Lanning] is located" provides an avenue through which the personal representative of Gestring's estate may seek redress for personal harm she has suffered by being the wife deprived of the society, comfort, and companionship of Gestring as a direct consequence of an EMTALA violation inflicted upon Gestring. See, e.g., *Correa v. Hospital San Francisco*, 69 F.3d 1184 (1st Cir. 1995); *Lane v. Calhoun-Liberty County Hosp. Ass'n Inc.*, 846 F. Supp. 1543 (N.D. Fla. 1994); *Griffith v. Mt. Carmel Medical Center*, 842 F. Supp. 1359 (D. Kan. 1994). The mere fact that the personal representative has rested her wrongful death cause of action, at least in part, upon an alleged EMTALA violation does not justify a directed verdict as to the entire cause of action.

A cause of action consists of the fact or facts which give one a right to judicial relief against another; a theory of recovery is not itself a cause of action. *Bargmann v. State*, 257 Neb. 766, 600 N.W.2d 797 (1999). Thus, two or more claims in a petition arising out of the same operative facts and involving the same parties constitute separate legal theories, either of liability or damages, and not separate causes of action. *Id.* Whether more than one cause of action is stated depends mainly upon (1) whether more than one primary right or subject of controversy is presented, (2) whether recovery on one ground would bar recovery on the other, (3) whether the same evidence would support the different counts, and (4) whether separate causes of action could be maintained for separate relief. *Id.* The crucial inquiry in regard to the district court's grant of the directed verdict is whether the personal representative's EMTALA claim constitutes a separate cause of action or merely a theory of recovery under which she can recover for the wrongful death of Gestring.

The U.S. Court of Appeals for the Eighth Circuit has stated that " 'EMTALA is not a federal malpractice statute and it does not set a national emergency health care standard; claims of misdiagnosis or inadequate treatment are left to the state malpractice arena.' " *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir. 1996). Accord *Brooks v. Maryland General Hosp., Inc.*, 996 F.2d 708 (4th Cir. 1993). Thus, a hospital's liability under EMTALA is not grounded upon tort concepts. An EMTALA plaintiff's claim does not rest on any proof that a hospital was negligent; it is predicated on the hospital's violation of a federal statute, making the hospital strictly liable for any personal harm that directly results from that violation. *Griffith v. Mt. Carmel Medical Center, supra.* Therefore, state malpractice law and general principles of negligence provide one theory of recovery against a hospital where the alleged substandard treatment results in wrongful death, and EMTALA provides a separate and distinct theory of recovery, either of which may be invoked by a plaintiff in a cause of action for wrongful death.

The personal representative's petition contains a prayer in which she seeks recovery against Mary Lanning on a negligence

theory, in addition to her claim based upon Mary Lanning's alleged EMTALA violations. As the trial progressed, the personal representative's counsel withdrew the issue of Mary Lanning's negligence from the case, conceding that there was no evidence upon which the jury could conclude that Mary Lanning was negligent. Such a concession does not, however, result in the automatic dismissal of the wrongful death claim against Mary Lanning based upon alleged violations of EMTALA. EMTALA provides a separate *theory of recovery* under which a plaintiff may seek relief in a wrongful death *cause of action.* While the district court may have properly disposed of the personal representative's negligence theory of recovery against Mary Lanning, it should not have sustained the motion for a directed verdict in regard to the entire "wrongful death action."

[15,16] This court has long adhered to the principle that a proper result will not be reversed merely because it was reached for the wrong reason. *Corcoran v. Lovercheck*, 256 Neb. 936, 594 N.W.2d 615 (1999). We have also stated that a trial court should direct a verdict as a matter of law only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom. *Nelson v. Lusterstone Surfacing Co.*, 258 Neb. 678, 605 N.W.2d 136 (2000). Consequently, the directed verdict on the EMTALA claim may still have been appropriate if the evidence at trial was such that reasonable minds could draw but one conclusion in regard to the EMTALA claim against Mary Lanning. The following analysis of the EMTALA requirements demonstrates that such is not the case:

[17,18] Upon discovery of an emergency medical condition, EMTALA usually requires hospitals to treat the discovered condition. Under certain circumstances, however, EMTALA allows hospitals to transfer patients instead of treating them. See 42 U.S.C. § 1395dd(b)(1)(B). If a hospital elects to transfer the patient under 42 U.S.C. § 1395dd(b)(1)(B), that "hospital can [still] violate § 1395dd through the operation of its emergency room by failing to stabilize a patient's emergency medical condition before transferring or releasing the patient." *Delaney v. Cade*, 986 F.2d 387, 391-92 (10th Cir. 1993). With respect to an emergency medical condition described in 42 U.S.C. § 1395dd(e)(1)(A), the term "stabilized" means that "no mate-

rial deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). Because there is no dispute that Gestring suffered from an "emergency medical condition" or that Mary Lanning decided to transfer Gestring rather than provide treatment, the critical inquiry is whether Gestring's condition was stabilized at the time of transfer.

■ " '[T]he definition of "to stabilize" asks whether the medical treatment and [transfer were] reasonable under the circumstances. This is obviously a factual inquiry . . . .' " *Delaney v. Cade*, 986 F.2d at 392. "To determine whether the defendants stabilized [Gestring's] medical condition before transfer, all the expert testimony submitted to the district court . . . must be considered." See *id*. Thus, if the testimony at trial denotes a genuine dispute concerning whether material deterioration was likely to occur during transfer, a jury should consider whether Gestring was "stabilized" as defined in EMTALA. See *id*.

At trial, Steven Tilles, M.D., testified that Gestring was not stable at the time he was transferred from Mary Lanning. Tilles testified that while Gestring may have been stabilized for transfer earlier on the day he was transferred, his condition had not been stabilized at the time the decision was made to transfer him to Lincoln. Bruce Hutson, M.D., stated that "there was 100 per cent chance . . . that [Gestring] was going to deteriorate during transit." Simply put, the jury could have accepted Tilles' and Hutson's testimony and found that because Gestring was not stabilized at the time of transfer, Mary Lanning was in violation of EMTALA and that such a violation was a cause of Gestring's death. The evidence places into question whether at the time of Gestring's transport, "no material deterioration of [his] condition [was] likely, within reasonable medical probability." See 42 U.S.C. § 1395dd(e)(3)(B).

■ Gestring's stabilization notwithstanding, a hospital may legally transfer someone who has an emergency medical condition which has not been stabilized if one of several conditions has been satisfied. If an individual at a hospital has an emergency medical condition which has not been stabilized, the hospital may not transfer the patient unless (1) the patient requests the transfer in writing or (2) a physician has signed a certifica-

tion that based upon the reasonable risks and benefits to the patient and the information available at the time, the medical benefits reasonably expected from the provision of appropriate medical treatment at another facility outweigh the increased risks to the individual's medical condition from effecting the transfer. EMTALA also allows such a transfer if, in the absence of a physician, a "qualified person" signs such a certification, which is subsequently countersigned by a physician. See 42 U.S.C. § 1395dd(c)(1)(A).

In addition to the obligation of certifying the medical need for transferring patients protected by EMTALA, hospitals also have an obligation to appropriately transfer such patients. See 42 U.S.C. § 1395dd(c)(2). The statutory definition of appropriate transfer requires, inter alia, that "transfer [be] effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer." 42 U.S.C. § 1395dd(c)(2)(D). See, also, *Burditt v. U.S. Dept. of Health and Human Services*, 934 F.2d 1362 (5th Cir. 1991). This statutory requirement has been interpreted as requiring "personnel and transportation equipment that a reasonable physician would consider appropriate to safely transport the patient in question." 934 F.2d at 1372.

At trial, the personal representative argued that Mary Lanning inappropriately transferred Gestring because he was not stabilized at the time of transfer; the personal representative further contended that had Barth properly certified that Gestring's condition was not stabilized at the time of transfer, the proper personnel and life support measures would have accompanied Gestring to Lincoln. Hutson testified that the box checked by Barth on the certificate of transfer form was not indicative of Gestring's condition at the time of transfer. Tilles testified that had Barth properly certified Gestring's condition as unstable, the awareness of the ambulance crew would have been heightened, and Gestring might possibly have survived the trip to Lincoln. Because the evidence is in dispute as to whether Gestring's transfer complied with EMTALA, the question whether Mary Lanning appropriately transferred Gestring was a question to be resolved by the jury. See *id.*

In summary, there was sufficient evidence upon which a finder of fact could have based the conclusion that Mary Lanning was in violation of EMTALA and, further, that the violation was a cause of Gestring's death. Due to the highly technical nature of the definitions contained within EMTALA, the district court should properly instruct the jury thereon prior to submitting any EMTALA issues for decision. We conclude that the district court improperly sustained Mary Lanning's motion for a directed verdict on the wrongful death action.

## CONCLUSION

For the foregoing reasons, we conclude that the personal representative's motion for a new trial should have been sustained; thus, we reverse the judgment of the district court and remand this matter for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

CONNOLLY, J., not participating.